STATE

v.

Christopher J. HIGHTOWER.

93–673–C.A.

Supreme Court of Rhode Island.

Aug. 1, 1995.

Jeffrey B. Pine, Atty. Gen., Annie Goldberg, Aaron L. Weisman, Asst. Attys. Gen., Providence, for plaintiff.

Mark L. Smith, North Smithfield, for defendant.

OPINION

WEISBERGER, Chief Justice.

This case came before the court on an appeal by the defendant, Christopher J.

Hightower (defendant or Hightower), from a judgment of conviction entered in the Superior Court for count 1, the murder of Ernest Brendel by torture and aggravated battery; count 2, the murder of Alice Brendel; count 3, the kidnapping of Emily Brendel, a child under sixteen; count 4, the murder of Emily Brendel; count 5, the breaking into and entry of the Brendel garage; count 6, the entry of the Brendel dwelling with intent to commit larceny; count 7 and 8, forging and counterfeiting a negotiable instrument with intent to defraud; and counts 9, 10, and 11, unlawful burial in violation of G.L.1956 (1989 Reenactment) § 23–4–7(b) and (f), as amended by P.L.1991, ch. 184, § 1. On count 1 Hightower was sentenced to life imprisonment without the possibility of parole pursuant to G.L. 1956 (1981 Reenactment) § 12–19.2–4, as amended by P.L.1984, ch. 362, § 2. For count 2 he was sentenced to life imprisonment to be served consecutively to the sentence in count 1. In count 3 he was sentenced to life imprisonment to be served consecutively to the sentences in counts 1 and 2. In count 4 he was sentenced to life imprisonment without parole, to be served consecutively to the sentences in counts 1 and 2 and concurrently with the sentence in count 3. On counts 5, 6, 7, and 8 he was sentenced to ten years' imprisonment on each count. On counts 9, 10, and 11 (the burial of the bodies) he was sentenced to five years imprisonment on each count and fined $10,000 on each count. In respect to counts 9, 10, and 11, the sentences were to be served consecutively to the sentences in counts 1, 2, 3, and 4. We affirm the judgment of conviction. The facts of the case insofar as pertinent to this appeal are as follows.

On September 22, 1991, Hightower came to the home of Christine Scriabine, who was entertaining some guests. He told Alexander Scriabine (Christine's husband) that he was a friend of Ernest Brendel, the brother of Christine Scriabine. After the guests had left, Hightower returned and informed the Scriabines that Ernest, Alice, and Emily Brendel had been kidnapped, most likely by members of the Mafia. He stated that his own wife and two sons had also been kidnapped. To corroborate his story, he produced the driver's license, some business cards, a bank card, and certain personal papers all relating to Ernest Brendel. He also presented some rings that he claimed were the property of Alice Brendel.

He further stated that he had received a call from the kidnappers in which they demanded a $300,000 ransom. Hightower stated that he could raise $175,000 himself and another $50,000 could be secured from Ernest Brendel's brokerage accounts, but the Scriabines would have to provide an additional $75,000 to make the exchange. He further related that Ernest Brendel had resisted the kidnapping and received a broken jaw in the ensuing struggle. He then showed the Scriabines a red Toyota that was the property of the Brendels. When he opened the trunk, Mrs. Scriabine was shocked at the amount of blood and the overwhelming odor of blood emanating from it. Alexander Scriabine, who was a physician and pharmacologist, remarked that the quantity of blood was too great for just a jaw injury. The Scriabines wanted to call the police, but Hightower admonished them that their phone had been tapped. Hightower left the Scriabine home at about 1 a.m. on September 23. Shortly thereafter, one of the Scriabines telephoned the Federal Bureau of Investigation (FBI) from the home of a neighbor.

Meanwhile, Hightower's wife, Susan Hightower, had told him she wanted a divorce. In the course of an argument, Hightower told her that he had placed a contract on her life for $5,000, with an extra $1,000 to make it appear accidental. The couple had made their home in Barrington with Susan's parents. This argument and the threat motivated Susan to seek a restraining order from the Rhode Island Family Court to mandate that defendant be ejected from her parents' home at One Jones Circle in Barrington.

An investigation that ensued following the call to the FBI disclosed that Ernest Brendel had filed a complaint against Hightower with the National Futures Association and the Commodities Futures Trading Commission. In his complaint Ernest Brendel had sought revocation of Hightower's license as a trading advisor. He claimed that Hightower had

mismanaged his account and had made material misrepresentations concerning moneys invested by Hightower for the benefit of Brendel. The investigation further disclosed that on September 19, 1991, Hightower had purchased a Bear Devastator cross bow together with six arrows and six special bullet-point tips.

Alice Brendel was last seen alive on Friday, September 20, 1991, when she rode the bus home from Providence. Her husband did not meet her as was his custom, so she walked toward her home alone. The child, Emily, who was ordinarily picked up by her father after the "School's out" program at the YMCA, on September 20, 1991, was met at the YMCA by Hightower, who presented Ernest Brendel's driver's license as proof of his authorization to take the child. Emily was not seen alive again.

At about 1:30 p.m. on Monday, September 23, Hightower was arrested. A search of his person disclosed $1,500 in currency, and his wallet contained three credit cards belonging to Ernest Brendel. Prior to his arrest, he had telephoned Christine Scriabine at her home and Dr. Scriabine at his office. He told them they need not worry further about raising money because he had arranged for return of the hostages. He further admonished them not to contact the authorities. That same day Hightower forged a check in the name of Alice Brendel in the sum of $1,500 payable to himself from the joint account of Ernest and Alice Brendel. He also mailed to the National Futures Association and the Commodities Futures Trading Commission a letter purportedly signed by Ernest Brendel and written on stationery bearing Ernest Brendel's letterhead, and containing a statement withdrawing the complaint against Christopher Hightower. This letter was later found to have been printed on the Brendel computer on September 22, 1991.

After Hightower was admonished concerning his *Miranda* rights, he agreed to talk to the police and told them a story similar to that which he had given to Dr. and Mrs. Scriabine. He stated to the Barrington police that he had inflated the amount of the ransom in order that he might keep $100,000 himself to help with his financial problems.

A typed statement was prepared by the Barrington police, which Hightower signed after making certain corrections. He was then further questioned by the Rhode Island State Police, after which he was taken to a cell. Sergeant John Lazzaro of the Barrington police had been assigned to watch Hightower. Shortly after 4 a.m. Lazzaro told Hightower that he would be leaving to check out certain tire tracks near Hightower's residence. At this point Hightower stated to Lazzaro, "Sarge, you're wasting your time. They are not buried there."

Efforts to find the whereabouts of the Brendel family were unavailing until November 7, 1991, when a Katherine McCloy was walking with her dogs in an area near St. Andrew's School off Middle Highway in Barrington. One of the dogs ran into the bushes adjacent to the trail that McCloy was following and would not return when called. McCloy followed the dog and found her sniffing in an area where there were two depressions in the ground along with a small amount of white powder. McCloy, who had gardening experience, formed an opinion that the white powder was lime. She went home and called the police. The bodies of Ernest, Alice, and Emily Brendel were found buried in that location later that same day.

The bodies were transported to the office of the State Medical Examiner, where it was determined that all three deaths were the result of homicide. Ernest Brendel had died as a result of two arrow wounds to the chest. In addition, there were apparently nonfatal fractures of the skull, lacerations of the scalp, and arrow wounds in the buttocks. Alice Brendel had died as a result of strangulation by a ligature compression of the neck. The cause of Emily Brendel's death could not be determined to a reasonable degree of medical certainty.

Following the discovery of the bodies, Hightower was indicted in an eleven-count indictment for the offenses for which he was later convicted and sentenced. He moved for a new trial but later withdrew the motion.

In support of his defense Hightower testified (against his lawyer's advice) that he had witnessed the murders by four unknown

men, two of whom were Latinos and two of whom were Orientals. He further testified that he had been forced by the unknown assailants to dig two graves. He also presented a defense of insanity. Both his factual defense and his defense of insanity were rejected by the jury.

In support of his appeal defendant raises nine issues. These issues will be considered in the order in which they are set forth in defendant's brief. Further facts will be supplied as may be necessary to deal with these issues.

## I

### THE BIFURCATED TRIAL

The defendant argues that the trial justice committed reversible error in declining to grant defendant's request for a bifurcated trial. The gist of defendant's argument is that a single trial deprived him of the opportunity to present two inconsistent theories of defense to two different triers of fact. In short, defendant claims that his testimony that the crime of murder of the Brendel family was committed by four unknown assailants was inconsistent with his claim of lack of criminal responsibility due to his mental illness as presented by a clinical psychologist who found him to be suffering from paranoid schizophrenia. Essentially the claim of lack of criminal responsibility due to mental illness (insanity) is a plea of confession and avoidance pursuant to which a defendant concedes the commission of the crime but claims that he or she is not responsible for his or her act because by reason of mental illness he or she was unable to conform his or her conduct to the requirements of law. *See State v. Johnson*, 121 R.I. 254, 399 A.2d 469 (1979). In *State v. Smith*, 512 A.2d 818 (R.I.1986), we considered the question of bifurcating a trial wherein a defendant raises the defense of insanity but also wishes to present evidence that he or she did not in fact commit the crime with which he or she is charged or wherein the defendant wishes to put the state to its proof concerning the elements of the crime. We stated unequivocally "that a bifurcated trial is neither constitutionally mandated nor statutorily authorized." *Id.* at 820 (citing *People v. Alerte*, 120 Ill.App.3d 962, 974, 458 N.E.2d 1106, 1114 (1983), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985)).

In the course of this opinion we examined decisions from other jurisdictions that have allowed bifurcated trials in circumstances in which a defendant seeks to present a substantial defense on the merits. *See, e.g., State v. Ward*, 301 N.C. 469, 272 S.E.2d 84 (1980); *State v. Boyd*, 167 W.Va. 385, 280 S.E.2d 669 (1981). However, we declined to adopt the rules enunciated in the foregoing cases and determined that a single trial on the issues of guilt and insanity was preferable because it had the effect of conserving judicial resources and avoiding the inherent unfairness of giving the accused two chances at acquittal. *Smith*, 512 A.2d at 822 (citing *State v. Haseen*, 191 N.J.Super. 564, 567, 468 A.2d 448, 449 (1983)).

We pointed out that the choice in presenting inconsistent defenses is a choice made by the defendant. 512 A.2d at 821. We further noted that attempting to draw a logical and administratively feasible line between the evidence of the insanity defense and the evidence supporting the defense on the merits is "a 'herculean task.'" *Id.* at 822 (citing Louisell & Hazard, *Insanity as a Defense: The Bifurcated Trial*, 49 Cal.L.Rev. 805, 820 (1961)).

In summary we concluded that a single proceeding within which the jury is given the entire picture of the case and in which both the issue of insanity and the issue of defense on the merits are considered in a joint trial is a preferable course to follow. *Smith*, 512 A.2d at 822. We reaffirm this holding. In a trial for murder, as in the case at bar, not only is the defendant entitled to a fair trial but so also are the people of the State of Rhode Island entitled to a fair trial. Fairness of presentation is not enhanced or supported when two juries are given inconsistent defenses without being aware of the totality of the circumstances that may only be made apparent by presentation of all issues in one proceeding.

The state in its argument points out that at the time of the request for bifurcation, the nature of defendant's proposed presentation on the merits was unknown. The state also points out that defendant was not timely in asserting the defense of insanity. However, our holding in *State v. Smith, supra,* and our reaffirmation of that holding would not be dependent upon these circumstances even if defendant presented an indication of a substantial defense on the merits. Our position that he would not be entitled to a bifurcated trial would be unchanged.

Consequently the trial justice committed no error in denying defendant's request for a bifurcated trial on the issues of insanity and his defense on the merits.

## II

### THE MOTION FOR RELIEF FROM PREJUDICIAL JOINDER

The defendant moved before the trial justice that he be given a separate trial on each of the three murder counts and also that he be given a separate trial on the kidnapping count in respect to Emily. The defendant claimed that he might desire to testify on one or more of the offenses but might assert the Fifth Amendment privilege not to testify in respect to other counts. He relied in his motion upon Rule 14 of the Superior Court Rules of Criminal Procedure, which provides that the court may order separate trials of the counts if it appears that a defendant is prejudiced by joinder of offenses in an indictment.

■ In the case at bar the indictment contained eleven counts that were joined pursuant to Rule 8(a) of the Superior Court Rules of Criminal Procedure since all the counts were based on the same act or transaction or on two or more acts or transactions connected together and constituting parts of a common scheme or plan. There seems no question that the murders of the three members of the Brendel family, the kidnapping of Emily Brendel, the breaking and entry into the Brendel premises, the issuance of the forged checks, and the burial of the bodies all took place within a timeframe of approximately five days, beginning September 19

and ending with Hightower's arrest on September 23. The eleven counts were properly joined pursuant to Rule 8(a) as we decided in *State v. Lassor,* 555 A.2d 339 (R.I.1989).

In *Lassor* we also recognized that counts that might be joined pursuant to Rule 8(a) might nevertheless be a proper subject for a motion for severance in the event that the defendant was able to show "such prejudice as might constitute a denial of his right to a fair trial[.]" 555 A.2d at 345; *see also State v. Whitman,* 431 A.2d 1229, 1232–33 (R.I. 1981); *State v. Sharbuno,* 120 R.I. 714, 717–19, 390 A.2d 915, 917–18 (1978). We went on to hold in *Lassor* that our standard of review of a trial justice's decision declining to sever counts pursuant to Rule 14 has been that of an abuse of discretion. 555 A.2d at 345 (citing *Whitman,* 431 A.2d at 1233).

In *Lassor* the defendant had been charged with three counts of murder, one count of attempted murder, and one count of first-degree sexual assault. The offenses had occurred over a relatively short period from June to September during the year 1984. 555 A.2d at 340. We held that the crimes were sufficiently similar so as to show a common scheme or plan as had been found to exist in *Whitman* and *Sharbuno. Id.* at 346. We went on to comment that it would have been difficult if not impossible to segregate the testimony relating to certain aspects of one crime, particularly the taking of a statement from the defendant, from aspects relating to other crimes. We suggested that severance would have created confusion and unanswered questions in the minds of the jurors if they heard a truncated version in respect to each offense. *Id.* In commenting upon the defendant's suggestion that he would have testified in respect to certain counts in the event of severance, we noted that he did not point out to the trial justice or to this court what his testimony would have been in respect to the counts upon which he proposed the possibility of testifying. *Id.* In *Lassor,* as in this case, the effect of this undescribed testimony was left wholly to speculation. *See id.*

■ The problems enunciated in *Lassor* are even more compellingly applicable to the

case at bar. Here the state charged three murders and a kidnapping that were virtually contemporaneous. The charges of breaking and entering, the forgery of two checks, and the burial of the bodies of the victims were all inextricably intertwined with the common scheme and design of murdering an entire family.

Not only were these offenses properly joined under Rule 8(a) but the judge was entirely correct in declining to sever the charges pursuant to Rule 14.

### III

### THE SEQUESTRATION OF THE JURY

■ The defendant argues that it was reversible error for the trial justice to deny his repeated motions to sequester the jury for the duration of the trial. It is true that a trial justice is given discretionary power to sequester a jury by G.L.1956 (1994 Reenactment) § 12–17–13. It is important to note that sequestration of a jury is not an end in itself but is a means toward insulation of a jury from external influences including media reports that could dilute the jury's impartiality.

We noted in *State v. Cline*, 122 R.I. 297, 316, 405 A.2d 1192, 1203 (1979), that when a defendant makes a claim that a trial jury has been subjected to exposure to newspaper articles during the course of a trial, it is necessary for the defendant to make a showing that he or she was prejudiced thereby. Earlier in *Palmigiano v. State*, 120 R.I. 402, 387 A.2d 1382 (1978), we enunciated with approval the following general principle:

"Newspaper and television publicity surrounding a trial represent the most common threats to the integrity of the proceedings. This is not to suggest, however, that juror exposure to any publicity vitiates the fairness of the trial. The severity of the threat depends upon both the nature of the information so publicized and the degree of juror exposure to it." *Id.* at 407–08, 387 A.2d at 1385 (quoting *United States v. Thomas*, 463 F.2d 1061, 1063 (7th Cir.1972)).

■ Consequently in order to establish reversible error, defendant must establish that he was prejudiced by publicity or other external influences that interfered with the deliberations of the jury to such an extent that he was deprived of his right to a fair trial. In the case at bar no such showing has been made.

■ Although the trial justice did not sequester the jury, he repeatedly instructed the jurors at each adjournment of the court that they were not to discuss the case with one another or with anyone else. He further admonished them that they should not watch any television program or read any newspaper article relating to the case before them. During the course of the trial defendant's counsel made reference to a report on the radio and television media of an "alleged plot between Mr. Hightower and others at the Adult Correctional Institution (ACI) to harm potential witnesses in this case." The trial justice, at the request of defense counsel, polled the jurors concerning whether any of them had heard the broadcasts or any references made to the broadcast. Two jurors reported that they had heard fragments on the bus but one juror asked that the speakers not discuss the matter and the second juror immediately removed himself from the location and did not obtain any significant information from the fragments. A third juror stated that she had heard something about the ACI and that defendant may have attempted an assault on an inmate or inmates at the institution.

The defendant, under oath, and after consultation with his attorney, stated that he desired to excuse only the one juror who had heard the allegation concerning the assault. He was not concerned about the other two jurors and requested that he be allowed to continue the trial with fifteen jurors instead of sixteen jurors. The trial justice acceded to this request and excused the one juror who had heard more than a mere fragment concerning the report.

The only other report brought to the attention of the trial justice of media influence was a broadcast from a Boston television station concerning the case. Again the trial justice polled all fifteen remaining jurors in-

dividually, and all stated that they had not watched or heard any Boston television station. Counsel for defendant was satisfied with this examination and suggested that the trial continue.

Later that same day counsel for defendant informed the trial justice that a local radio station planned to conduct a poll concerning whether Hightower was guilty or not guilty of the charges on trial. Apparently, the poll either was not broadcast or in any event never reached the attention of any of the jurors. The trial justice gave a very stern instruction to the jurors that they should pay no attention to any such broadcast and that they alone must decide the guilt or innocence of defendant and determine what their verdict should be. He also complimented them upon their performance of a civic duty.

The next reference came to the attention of the court on April 5, 1993, when the court became aware that counsel for defendant had been quoted in an article in the Boston Globe concerning the case. There was no indication that any juror had read the article, and the trial justice rebuked counsel for having made such public comment. Thus there is not the slightest indication that any prejudicial media reports or any other external reports came to the attention of the jurors throughout the trial save in the one instance when a juror was excused at the request of defendant. Consequently defendant can point to no instance of prejudicial intrusion upon the evidence submitted to the jurors as a result of lack of sequestration.

■ Indeed, sequestration in and of itself is not a right in any sense. In the event that prejudicial publicity had come to the attention of the jurors, defendant's remedy would have been to move for a mistrial as a result of the interference with the impartiality of the jurors. See, e.g., State v. Gibbons, 418 A.2d 830, 838 (R.I.1980); State v. Palmigiano, 115 R.I. 166, 168–69, 341 A.2d 742, 743 (1975).

The trial justice committed no reversible error by declining to sequester the jurors since no prejudicial external influences resulted from the lack of sequestration.

## IV

## THE MOTION FOR CHANGE OF VENUE

■ At the outset of the case counsel for defendant requested a change of venue from the State of Rhode Island to some metropolitan area in the Commonwealth of Massachusetts such as Suffolk, Middlesex, or Worcester. In support of this request, defense counsel asserted that publicity had so permeated the entire State of Rhode Island that affording defendant a fair trial in any county of this state would be impossible. Not surprisingly defendant cited no authority or precedent for such a request. The trial justice responded that he had no jurisdiction to conduct a trial outside the boundaries of the State of Rhode Island. The defendant concedes on appeal that the trial justice did not have the option of conducting a trial in an adjacent state.

■ However, defendant then argued to the trial justice, and argues before us now, that he should have transferred the case out of Providence County to another county in the State of Rhode Island "in which both the opportunity and likelihood of pretrial and trial publicity would be lessened." As a supplement to his motion for a change of venue, defendant attached articles that had appeared in the Providence Journal relating to the crime with which he was charged. These articles were published between September 24 and November 18, 1991. The trial began in March of 1993. It is conceded by counsel for defendant (and was argued initially by him) that the entire State of Rhode Island had been covered by the Providence Journal and also by reports of other elements of the media that blanketed this state.

Consequently it was extremely unlikely that any county outside the counties of Providence and Bristol (which are combined for purposes of juror selection) would have produced an array of persons who would be less likely to have been exposed to publicity than those of the most populated area from which the jurors were actually selected.

It is undisputed that sixteen jurors were selected after individual voir dire examina-

tion in which defense counsel was permitted to question the prospective jurors intensely concerning their impartiality and any publicity that may have come to their attention. At the end of the selection process, counsel for defendant declared that the sixteen jurors were satisfactory to him. Not only did he fail to present convincing evidence of local prejudice, *see State v. Sisson,* 58 R.I. 200, 203, 192 A. 209, 211 (1937), he presented no evidence whatever of actual prejudice on the part of the jurors ultimately selected from the Providence County array.

The trial justice did not err in denying the motion for change of venue in the circumstances of this case.

V

## THE ATTENDANCE OF DEFENDANT AT THE VIEW

■■■■ Counsel for the prosecution requested a view of certain locations in the Town of Barrington that might enable the jurors to better understand the evidence when submitted. The defendant did not object to the view but expressed a desire to attend. The trial justice did not deny defendant's request to attend the view but cautioned that the marshals who were responsible for security outside the courtroom might require that he be shackled during the course of the view. Upon inquiry made to the State Marshals, an unequivocal answer was given that defendant would be under restraint for the duration of the view. The defendant chose not to attend the view if he were to be shackled. Defense counsel objected on the ground that if defendant were to attend the view, he would be shackled at the direction of the marshals, rather than at the direction of the court. His attorney attended the view on defendant's behalf. The defendant argues that the trial justice committed reversible error by (1) delegating the decision whether to physically restrain defendant if he attended the view to the state marshals, and (2) refusing to overrule the decision of the marshals to subject him to physical restraint. The defendant claims that as a result of the marshals' decision to physically restrain him he was thereby pre-

cluded for all practical purposes from attending the view. The state on the other hand argues that the sole discretion to provide security outside the courtroom was that of the Rhode Island State Marshals pursuant to the provisions of G.L.1956 (1993 Reenactment) § 42–56–3(e)(1), (4), (7), and (9).

■■■■ The state also points out that pursuant to G.L.1956 (1985 Reenactment) § 9–16–1 the court has discretion to order a view on the request of either party and in its further discretion may accompany the jury. The court is not required to attend the view. It is further well settled under Rhode Island law that the object of a view is not to obtain evidence but merely to enable the court and the jury better to understand the evidence when it is submitted. *See, e.g., Kulpa v. General Ice Cream Corp.,* 71 R.I. 168, 174, 43 A.2d 60, 63 (1945); *State v. Smith,* 70 R.I. 500, 507, 41 A.2d 153, 157 (1945); *State v. Germain,* 47 R.I. 269, 270, 132 A. 734, 735 (1926). Even assuming without deciding that the court might have the power to overrule the marshals concerning security arrangements, it is no abuse of discretion for the trial justice to take into account the advice of marshals or deputy sheriffs in determining what is necessary for the security of the participants in a trial whether in a courtroom or outside the courtroom. *State v. Byrnes,* 433 A.2d 658, 663 (R.I.1981). It was certainly no abuse of discretion to require a person accused of a most violent crime to be reasonably restrained by handcuffs and/or shackles in an open area in the presence of jurors and other participants.

■■■■ In any event, defendant's presence at a view is not a critical stage of the trial since his participation at the view would be virtually nonexistent save to be certain that the jurors were brought to the right place to which the evidence later presented would appropriately relate. *Snyder v. Massachusetts,* 291 U.S. 97, 108, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679 (1934). In that case the Court held that the defendant's absence from a view was not a violation of his constitutional rights even though the trial judge described the view as evidence. *Id.* at 121, 54 S.Ct. at 338, 78 L.Ed. at 686. In the case at bar defendant's attorney attended the view

and represented defendant's interests. His attorney expressly stated that he had no objection to anything that happened at the view.

Consequently defendant suffered no prejudice as a result of his voluntarily absenting himself from the view, and there was no abuse of discretion on the part of the trial justice in deferring to the marshals' determination that restraint upon defendant at the view would be required.

## VI

### THE MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH TWO SEARCHES OF DEFENDANT'S BUSINESS OFFICE AND ONE SEARCH OF THE SLICKER RESIDENCE

The defendant contends that the trial justice erred in denying his motion to suppress evidence obtained from two searches conducted at Hightower's business office as well as that obtained from one search conducted at the Slicker residence, owned by his wife's parents but claimed as defendant's marital residence.

### A

#### THE FIRST SEARCH

■ The first warrant to search defendant's office was issued on September 23, 1991, by a judicial officer pursuant to an affidavit and application filed by Corporal James C. Lynch, Jr., of the Rhode Island State Police. The affidavit contained information given to the Barrington police by an agent of the FBI, Jack McGraw, concerning a call made by the sister of Ernest Brendel, Christine Scriabine (Christine). The affidavit recounted that Christine reported to a representative of the FBI that Hightower had come to her home in a red Toyota automobile owned by Ernest Brendel. She stated that Hightower told her he needed money to pay ransom to a group of abductors who had kidnapped both Hightower's family and the Brendel family. The affidavit went on to say that Christine had seen what appeared to be blood in the back of the car and as a result of Hightower's statements had called the FBI office in Hartford.

The affidavit further set forth that on the basis of this information Barrington police went to 51 Middle Highway, the home of the Brendel family, knocked at the door at about 11 a.m., and found no one at home. Detective Gary Palumbo of the Barrington police checked the garage area and found that a portion thereof had been recently washed down and swept. He further observed a wet area and wet brooms in the garage. The Barrington police then issued a broadcast to pick up and hold Christopher Hightower operating a 1988 red Toyota. Shortly thereafter, the vehicle described in the broadcast was stopped in the parking lot of St. John's Church on County Road. Operating the vehicle was Christopher Hightower. On his person Sergeant Lazzaro found credit cards belonging to Ernest Brendel. He noted a white powder covering the entire rear section of the vehicle and also what appeared to be copious amounts of blood in the rear area of the vehicle. The sergeant noted a large bag of lime on the floor in the rear of the vehicle. Hightower was taken to the Barrington police department, and the vehicle was towed to the town garage.

The affidavit further recounted that at the police station Hightower was advised of his rights by Sergeant Lazzaro and FBI Agent McGraw. Thereafter he was interviewed and made statements that he had hidden in his office at 580 Maple Avenue in Barrington a sawed-off shotgun and an automatic handgun. Hightower further stated that there was a large amount of human blood in the rear of the vehicle which Hightower had washed out of the vehicle on Sunday, September 22, 1991, at 51 Middle Highway in the garage. Hightower further stated that he was having marital problems and stayed at the Brendel residence on September 19 and 20 and then stayed at his office on September 21 for the night.

Relying on the foregoing information contained in the affidavit, Corporal Lynch requested the issuance of a warrant to search both the premises at 580 Maple Avenue and the Toyota vehicle.

■ The defendant asserts that the foregoing affidavit was insufficient to establish probable cause for the issuance of a warrant to search the Maple Avenue office and that the trial justice should have suppressed the fruits of that search. With this contention we emphatically disagree. Indeed, this affidavit is a classic example of the establishment of probable cause by virtually all definitions given by both the Supreme Court of the United States and this court. The most recent comprehensive definition of probable cause for a search was set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates* the Court adopted a totality-of-the-circumstances test for a finding of probable cause. That test is characterized by flexibility.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for * * * conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332, 76 L.Ed.2d at 548 (citing *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960)).

We recognized this totality-of-the-circumstances test in *State v. Pacheco*, 481 A.2d 1009, 1020–21 (R.I.1984), in which we dealt to some extent with the reliability of an informant. This affidavit would pass with flying colors the totality-of-the-circumstances test set forth in *Gates*. Here we have no anonymous informant but reliable information based upon statements made by Ernest Brendel's sister and an officer of the FBI, observations of officers of the Barrington police department, and most significantly statements made by defendant himself. From these statements a judicial officer would be not only justified but almost compelled to draw inferences that members of the Brendel family were in grave danger and had been abducted and that one or more of them were seriously injured. The judicial officer would also be compelled to draw the inference that Hightower was deeply implicated in the abduction and probably knew a great deal more about the missing members of the Brendel family than he had admitted to the police. The exigency surrounding the fate of the missing Brendels could scarcely be doubted. A judicial officer could properly draw an inference that they were in grave danger and that various weapons (a sawed-off shotgun and an automatic handgun) as well as other evidence would probably be found in the Maple Avenue office. *See State v. Kowal*, 423 A.2d 1380, 1383 (R.I.1980). These inferences need not rise to the level of proof beyond a reasonable doubt but only to establish probable cause. *Id.; State v. Read*, 416 A.2d 684, 690 (R.I.1980).

Looking at the totality of the circumstances, we find it abundantly evident that the trial justice was correct in declining to suppress evidence derived from the first search of the office at 580 Maple Avenue, Barrington.

## B

### THE SECOND SEARCH OF MAPLE AVENUE

■ After the first search had been completed, Corporal Lynch prepared a second affidavit dated October 2, 1991, in which he repeated in part grounds for the first search of the office at 580 Maple Avenue and then went on to describe the results of a continuing investigation. This investigation disclosed that Ernest Brendel had filed a complaint with the National Futures Association (NFA) in New York against Christopher Hightower for misrepresentation. The corporal contacted the NFA to corroborate the existence of the complaint and further learned most significantly that the NFA had received a letter from Ernest Brendel on September 25, 1991, dated September 19, 1991, and postmarked September 23, 1991. This letter purportedly from Ernest Brendel indicated that he wished to withdraw his complaint against Hightower. The circumstances and timing of this letter together with an examination of the documents indicated that the letter had been falsified and

prepared by Hightower rather than written by Brendel. The corporal went on to state in the affidavit that financial documents had been noted at the time of the first search that, in light of this further information, had become highly significant to the investigation. He asked for permission to search the premises at 580 Maple Avenue again in order to investigate the documents that might pertain to the relationship between Hightower and Ernest Brendel. A judge of the District Court issued a search warrant authorizing a search for financial records of Ernest Brendel, lists of clients of Hightower, Inc., business records, and papers of the Brendel family. The trial justice found that this warrant was issued on the basis of probable cause. With this finding we totally agree. The mysterious letter purportedly from Ernest Brendel to the NFA opened an important area to include the probability of motive for Hightower's abduction, injury, and probable homicide of the entire Brendel family. Although motive is not an essential element of the crime of murder, it is certainly a relevant factor in proving that a defendant has committed the crime with which he or she is charged. *See State v. Gazerro,* 420 A.2d 816, 825 (R.I.1980). This affidavit established probable cause within its own four corners and was further based upon the first search, which met all constitutional and legal requirements. The trial justice did not err in declining to suppress the evidence obtained from the second search.

## C

### THE SEARCH OF THE SLICKER RESIDENCE

Hightower had been residing in Barrington with his wife Susan and her parents, in the home owned by Susan's parents. This residence was searched as a result of consent given by Clyde Slicker, the owner of the premises and Susan's father.

■ Both the state and defendant have advanced arguments against and in favor of the proposition that Hightower had standing to object to the search. The state argues that Hightower had been excluded from the premises as a result of a restraining order

issued by the Family Court. This restraining order was issued after Hightower had told his wife that he had "paid somebody $5,000 to have [her] killed" and had added "an extra thousand to make it look like an accident." Pursuant to the restraining order Hightower was escorted from the premises on Friday, September 20 (prior to the date of the search), by a constable and Barrington police officers. In light of the restraining order, it is highly doubtful that Hightower had the necessary standing to object to the search following his exclusion from the premises. *See Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). However, for purposes of this opinion, we shall assume, without deciding, that Hightower still retained standing to object to a search of his personal effects within the dwelling. This standing would be of little assistance to Hightower.

■ It is well established that a search conducted pursuant to a valid consent is constitutionally permissible. *See United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *State v. Beaumier,* 480 A.2d 1367, 1374 (R.I.1984). It was further established in *Matlock* that any coinhabitant could validly give consent to search premises shared by another person. 415 U.S. at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 249–50. Certainly Clyde Slicker had not only common authority but principal authority over all portions of the premises as the owner and primary occupant thereof. Consequently consent given by such a coinhabitant would be valid as against Hightower even if he had appropriate standing to object to the search. *See State v. O'Dell,* 576 A.2d 425 (R.I.1990). The trial justice was correct in declining to suppress the fruits of the search of the Slicker residence.

## VII

### THE MOTION TO SUPPRESS HIGHTOWER'S STATEMENTS TO THE POLICE

Counsel for defendant argues on appeal that Hightower's statements given to the Barrington police and the State Police should have been suppressed because he claims that

Hightower had requested the presence of counsel. No such issue was raised before the trial justice on the motion to suppress.

The only two witnesses who testified in support of the voluntariness of the confessions were Sergeant Lazzaro of the Barrington police department and Sergeant Richard Hurst of the Rhode Island State Police. Sergeant Lazzarro testified that he gave *Miranda* admonitions to Hightower immediately upon confronting him in the Brendel vehicle. Hightower responded to the oral admonitions by stating that he understood his rights and did not need an attorney and further that he wanted to help in the investigation of the missing members of the Brendel family. He was then transported to the Barrington police headquarters where he was again advised of his constitutional rights from a prepared form. He was then given the rights form and asked to read it aloud. He did so. He initialed each portion of the form and then signed the entire form. His signature was witnessed by two members of the Barrington police department, including Sergeant Lazzaro and by FBI Agent McGraw. He was then offered the use of a telephone in order to contact an attorney if he so desired. He stated that he did not wish to call an attorney at that time. Sergeant Lazzaro then interrogated defendant and prepared a typed statement, which defendant examined, corrected, and signed. At no time did he request an attorney even though Lazzaro advised him during the course of the statement that he should consider consulting with counsel.

After the Barrington police had taken a statement, Sergeant Hurst and Detective David Dias of the Rhode Island State Police presented a second *Miranda*-type of rights form to Hightower, which he signed and which was witnessed by Hurst and Dias. Hightower then gave an extensive statement to Hurst, after which he was conducted to a cell for an overnight stay.

At about 4 a.m. Sergeant Lazzaro informed defendant that he was going to go out and check some tire tracks that had been observed in the area of Boxwood Court, a location near Jones Circle. Hightower responded to this information by saying "Sarge, you're wasting your time. They are not buried there. Call me an attorney for the morning. After talking to the attorney, if he says its all right, I will talk to you." This was the first time that Hightower requested an attorney during the course of his contacts with any of the members of the Barrington police or the State Police. This request was made long after the statements had been taken. Pursuant to the request, Sergeant Lazzaro communicated with the Chief of the Criminal Division of the Attorney General's office in order to see if arrangements could be made to contact an attorney from the Public Defender's office. The next morning a representative of the Public Defender's office came to the Barrington police station to see Hightower.

■ Relying upon the uncontradicted testimony of the two officers, which was buttressed by the waiver-of-rights forms signed and initialed by defendant, together with the signed statements, one of which had been corrected by defendant in his own handwriting, the trial justice observed that the state had established the voluntariness of these statements not only by clear and convincing evidence but beyond a reasonable doubt as well.

■ Although our review of a trial justice's findings of voluntariness is deferential, *see State v. Leuthavone*, 640 A.2d 515, 518–19 (R.I.1994), in this case the findings of the trial justice are unassailable since he had nothing before him save evidence that Hightower had intentionally, and after multiple admonitions, waived his right to remain silent and his right to counsel. There was not a scintilla of evidence that he requested counsel until his final exchange with Sergeant Lazzaro at about 4 a.m.

The only time that defendant raised the question of a request for counsel was in his testimony to the jury. The jury did not believe him in light of the massive documentary evidence to the contrary. However, his testimony to the jury would not affect the correctness of the ruling of the trial justice on the motion to suppress wherein no such testimony was presented. In light of the fact that the jury found that the statements were

voluntary by clear and convincing evidence pursuant to the trial justice's instructions, it is far more than probable that had he given this testimony to the trial justice at the suppression hearing, the same result would have occurred.

In any event there is no question that on the evidence presented to the trial justice in support of and in opposition to the motion to suppress, he made the only decision possible in denying the motion. The claim that he was in error has no merit.

## VIII

## THE VIDEOTAPE RECORDING OF THE EXCAVATION OF THE BODIES OF THE BRENDEL FAMILY

■ The defendant moved in limine to exclude the admission of a redacted videotape of the excavation of the bodies of the three members of the Brendel family. The trial justice denied the motion, citing *State v. Bowden*, 113 R.I. 649, 658, 324 A.2d 631, 637 (1974), *cert. denied*, 419 U.S. 1109, 95 S.Ct. 782, 42 L.Ed.2d 805 (1975), in which we stated that a photograph of a murder victim is admissible as long as it is competent evidence to prove a material fact in issue and not offered solely for the purpose of arousing the passions of the jury. The court further pointed out in that case that if these conditions are satisfied, the evidence is admissible even though the photograph may be unpleasant or may have an influence beyond the strict limits or purpose for which it was introduced. *Id.* at 658, 324 A.2d at 637. In this case the videotape of the excavation was concededly relevant to establish the death of Ernest, Alice, and Emily Brendel and the fashion in which their bodies had been interred in a shallow grave. In *State v. Bertram*, 591 A.2d 14 (R.I.1991), a photograph of the body of a sixteen-year-old girl who had been stuffed into a large hollow box serving as a luggage rack at a Holiday Inn was admitted into evidence. *Id.* at 16, 22. The photograph was taken a number of days after her death and some decomposition of the body had occurred. In passing upon the admissibility of this photograph, we held that it was relevant and that its probable proba-

tive value outweighed the danger of unfair prejudice. We stated that in order for a photograph to be unduly prejudicial, it must be "of such a nature as to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt." *Id.* at 23 (quoting *State v. Fenner*, 503 A.2d 518, 526 (R.I.1986)). In the case at bar no question exists that the videotape was unpleasant to view. The bodies were in such condition that it required the commentary of Sergeant Michael Quinn to describe the bodies as they were excavated. The trial justice concluded that various aspects of the videotape were completely relevant to the state's case, including matters bearing on the life-without-parole aspect of the crime. He further concluded, "I find that these films are not so inflammatory as to outweigh the probative value, therefore, I'm going to allow the exhibit in."

In making this finding, the trial justice did not err. Our test has been that unduly prejudicial evidence or prosecutorial comment is such that it so inflames the passions of the jurors as to prevent their ability to consider the evidence of the case impartially. *See State v. Brown*, 522 A.2d 208, 211 (R.I. 1987). In finding that the relevancy of the evidence outweighed its prejudicial effect, the trial justice did not commit any abuse of discretion. *See State v. Ware*, 524 A.2d 1110, 1113 (R.I.1987).

## IX

## THE MOTION FOR JUDGMENT OF ACQUITTAL

■ The defendant contends that his convictions for violation of G.L.1956 (1989 Reenactment) § 23–4–7, which charged him with the burying of dead bodies of the members of the Brendel family without notifying the proper authorities and doing same with the intention of concealing a crime, violated his privilege against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution. We believe that defendant waived this issue in the Superior Court and that it was not properly presented to the trial justice.

Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure provides as follows:

"*Defenses and Objections Which Must Be Raised.* The defense of double jeopardy and all other defenses and objections based on defects in the institution of the prosecution or in the indictment, information, or complaint other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the indictment, information, or complaint to charge an offense shall be noticed by the court at any time during the pendency of the proceeding."

Rule 12(b)(3) requires that such motion be made no later than twenty-one days after the plea of not guilty is entered.

In the case at bar, defendant did not raise this Fifth Amendment claim until he moved for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. The Superior Court justice refused to consider the issue at that time. In so doing, he was acting in accordance with our holding in *State v. Lee,* 502 A.2d 332, 334 (R.I.1985), wherein we determined that a defendant who did not raise the issue of double jeopardy until after the prosecution had rested its case, and during the course of a motion for judgment of acquittal and dismissal, had waived the claim under Rule 12(b)(2) and, therefore, was not entitled to our review of the issue on appeal. In *State v. Ahmadjian,* 438 A.2d 1070, 1088 (R.I.1981), we held that the failure to file appropriate pretrial motions objecting to the composition of the grand jury constituted a waiver of consideration of that claim pursuant to Rule 12(b)(2) and (3).

We are of the opinion that the challenge to the charges under § 23–4–7 was a defense based on defects in the institution of the prosecution that could be raised only by motion before trial pursuant to Rule 12(b)(2). Consequently the trial justice was correct in declining to consider the issue raised on a motion for judgment of acquittal. The defendant is not entitled to our review of this issue on its merits.

For the reasons stated, the appeal of the defendant is denied and dismissed. The judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.

BOURCIER, J. did not participate.