STATE

v.

Paul PEREIRA.

No. 2007–194–C.A.

Supreme Court of Rhode Island.

June 15, 2009.

Virginia M. McGinn, Department of Attorney General, for Plaintiff.

Catherine Gibran, Office of Public Defender, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice FLAHERTY, for the Court.

The defendant, Paul Pereira, appeals from judgments of conviction for sexual offenses against both his daughter and his niece, ensuing from separate incidents that occurred some sixteen to twenty-one years apart. The state filed an indictment in the Providence County Superior Court, charging Pereira with one count of first-degree child molestation sexual assault against his daughter, Amy, in violation of G.L.1956 §§ 11–37–8.1, 11–37–8.2 (count 1), one count of second-degree sexual assault against his niece, Kim, in violation of §§ 11–37–4(A), 11–37–5 (count 2), and one count of second-degree child molestation sexual assault against Kim, in violation of §§ 11–37–8.3, 11–37–8.4 (count 3).[1] After a trial, held in September 2006, a jury returned a guilty verdict on counts 1 and 2, but found the defendant not guilty of the charges alleged in count 3. Pereira was sentenced to forty years imprisonment at the Adult Correctional Institutions, with twenty-five years to serve on count 1, and a concurrent term of fifteen years, with ten years to serve, on count 2.

On appeal, defendant argues that the charges against him pertaining to the sexual abuse of his niece, alleged to have occurred between June 26, 1982, and May 10, 1984 (count 2), and between May 11, 1984, and December 9, 1984 (count 3), were misjoined with the sexual-molestation charges against him with regard to his daughter that allegedly occurred between July 8, 2000 and November 3, 2003 (count 1). The defendant also maintains that the trial justice erred when he denied defen-

dant's motion to sever the counts in the indictment, resulting in real and substantial prejudice against him and creating a considerable doubt about whether he received a fair trial. In addition, defendant submits that count 2 of the indictment should have been dismissed because of a violation of the *ex post facto* clauses of the state and federal constitutions. Further, defendant argues that the trial justice erred when he allowed a witness to testify about a prior consistent statement that Amy made when she reported the abuse by her father. As a result of the alleged errors, defendant contends that his convictions should be reversed and a new trial ordered. For the reasons stated below, we affirm the judgments of conviction.

### Facts and Travel

A call to Amy to "come downstairs I have something for you" are the words that the young nine-year-old girl testified led her into her father's bedroom. Amy recalled that the summons occurred sometime after she began kindergarten and that she was in her grandmother's upstairs apartment when her father called to her from the bottom of the stairs of her family's first-floor apartment.[2] After her father called to her, Amy dutifully walked down the stairs and into his bedroom, where he placed her on his bed, pulled down her pants and underwear, and inserted his fingers inside her "chixona."[3] Amy testified that "[i]t hurt" and that his hand "was moving." She remembered that she went back upstairs after this episode and that she did not tell anyone what had happened because she was scared.

---

1. We have given the victims fictitious names to protect their identity.

2. Amy testified that she was five years old when she was in kindergarten. According to the dates specified in the indictment, Amy

would have been between the ages of three and six years old at the time of the abuse.

3. Amy testified that her chixona was her "private part." Amy's mother testified that chixona is the Portuguese term for vagina.

Amy recalled that eventually she told her mother what had happened to her, but she did not recall when or where she was when she revealed the abuse. Amy's mother, Mrs. Pereira, testified that she became concerned in October 2003 because when she bathed Amy, the young girl would complain that her private parts "bothered her." Mrs. Pereira testified that she told defendant about Amy's complaints, but that he dismissed them as fabrications and he convinced her not to bring Amy to the doctor. Then, on November 3, 2003, Mrs. Pereira's concern for her daughter heightened because during more recent baths, Amy had insisted that her vagina hurt and because she seemed dismayed and would look seriously at her mother while remaining very quiet.

Mrs. Pereira testified that the next day, she decided to take Amy to the home of her friend Lucy in Fall River, Massachusetts. Lucy had a grown daughter with whom Amy had become close, and Mrs. Pereira thought that Amy might open up to her. Lucy testified, over defendant's objection, that on November 4, 2003, Mrs. Pereira brought Amy to her home because she was troubled about Amy's complaints during her baths. Lucy testified that she asked Amy what part of her body was hurting her during her baths, and Amy started to cry. Amy then pointed to her vagina. Lucy asked whether anyone had touched her there. Amy continued to cry, somberly looked down, and said that it was her father who had touched her with his fingers.

Mrs. Pereira testified that after she and Amy returned home later that day, her brother called the police. On cross-examination, however, she acknowledged that before the police were called, she went to her brother's house and first contacted a lawyer. The next day, on November 5, 2003, she met with the lawyer, and she

withdrew half the money from a joint bank account that she and her husband had maintained. She also testified that she filed and was granted a divorce from her husband, and as a result of a settlement, the family home was conveyed to her.

On November 6, 2003, Mrs. Pereira brought Amy to the Child Advocacy Center (CAC). There, Amy underwent a physical examination, and she was evaluated for signs of abuse. At trial, the director of the child protection program at Hasbro Children's Hospital testified that Amy's physical examination was normal, neither ruling out nor confirming that she had suffered any abuse. The director also testified that according to the agency's report, Amy had refused to answer any questions about the abuse and that she remained quiet and attentive, answering only simple questions.

On January 16, 2004, Mrs. Pereira brought Amy back to the CAC. During this second visit, Amy reported the abuse to the agency. She indicated that her father had touched her "a long time ago," and she answered questions about some of the circumstances surrounding her allegations of abuse. She reported that her father had been wearing pants and a shirt when he touched her, that her grandmother and her mother had been upstairs in her apartment, cooking, and that her brother also had been upstairs, watching television. The counselor inquired whether she had been touched in any other places, and she said no. The counselor also asked Amy whether she had touched her father's body; she replied that she had not.

When defense counsel cross-examined Amy about her visits to the CAC, she acknowledged that during the first visit in November 2003, she did not reveal to anyone that her father had touched her. Defense counsel then asked her whether she

had talked to anyone about her father in the interim, between her first and second visits to the CAC. She replied that she had spoken to her mother and to her cousin, Kim. She said that Kim told her that Pereira had been "bad" to her too, disclosing that he had done "the same thing" to her.

Kim, who was thirty-one years old at the time of trial, testified that when she was young, Pereira was her favorite uncle. As a child, she saw him every weekend. Pereira and his mother (Kim's grandmother) would visit Kim's home in Central Falls every other weekend. On the alternating weekends, Kim and her family would visit her grandmother's home in Fall River. Kim testified that on the weekends in Central Falls, the family had to share bedrooms because of a lack of space. She said that she would give her room to her grandmother, and she would have to sleep in her parents' room with Pereira.

Kim testified that at bedtime, during weekend visits, when she was between seven and a half and nine and a half years old, Pereira would expose his penis and place her hand on it. With his hand, he would guide her hand up and down. Although he had her touch him in this manner, she testified that he never touched her. According to Kim, this event happened every weekend that Pereira and his mother came to visit. She remembered that defendant's abuse of her ceased around the time that she turned ten years old, which was when he started dating Mrs. Pereira.

Kim also recalled that while she was putting away groceries on the evening of November 4, 2003, Pereira came into her home and frantically walked through the kitchen into her grandmother's room. A little while later, she talked to her aunt, who informed her about what Pereira had done to Amy. Kim recalled that she told her aunt to order Pereira to leave the house. She then overheard Pereira say, "I know that I did it to [Kim], but I didn't do it to my daughter."

Pereira filed several pretrial motions that the Superior Court denied and that are now before us on appeal. On October 19, 2005, a justice of the Superior Court heard defendant's first motion to dismiss. Pereira argued that the indictment contained charges that extended beyond the statute of limitations and that violated the *ex post facto* clauses of the state and federal constitutions.[4] The motion justice denied defendant's motions, but he also allowed the state to amend the indictment.

The state amended count 2 of the indictment on April 14, 2006. As amended, count 2 charged Pereira with second-degree sexual assault against Kim, under § 11–37–4(A), between June 26, 1982 and May 10, 1984, instead of child molestation under § 11–37–8.1. Pereira filed another motion, this time before the trial justice, asserting that the amended count 2 violated the *ex post facto* clauses of the state and federal constitutions. The trial justice heard and denied the motion, citing the law of the case. *See State v. Infantolino*, 116 R.I. 303, 310, 355 A.2d 722, 726 (1976). Then on September 21, 2006, the trial justice heard more argument on defendant's

---

4. Specifically, defendant argued that the charges created a statute-of-limitations issue because at the time of the alleged act, the statute of limitations for second-degree sexual assault was three years, and it was not until 1985 that the General Assembly added first- and second-degree child molestation sexual assault to the list of crimes for which no statute of limitations applied. Pereira also argued that applying the sexual-molestation statute, G.L.1956 § 11–37–8.1, to the acts alleged in count 2 created an *ex post facto* issue. He asserted that at the time of the alleged acts, the penalty was three to fifteen years under § 11–37–5, but that under the charged statute, which did not exist at the time of the alleged acts, the penalty would be six to thirty years.

*ex post facto* claim, and refused to reconsider defendant's motion.

Pereira also filed a motion to sever counts 2 and 3 from count 1 that was heard by the trial justice on September 11, 2006. Defense counsel argued that the charges in the indictment were misjoined under Rule 8(a) of the Superior Court Rules of Criminal Procedure and alternatively, that the court should sever the charges under Rule 14 of the Superior Court Rules of Criminal Procedure because joinder of the charges would prejudice him. Pereira maintained that he wished to testify about count 1 to deny the allegations with respect to his daughter, but that he "might not want to testify" with respect to counts 2 and 3, because he had made a statement against his interest concerning those charges. Therefore, he argued that trying the three counts of the indictment together would deny him his right to a fair trial. However, the trial justice denied the motion; the court held that the offenses properly were joined and that there was no reason to sever the charges. The trial justice reasoned that in most cases, severance is not required when the evidence is simple and distinct and that in this case, his concerns for efficiency, convenience, and judicial administration outweighed defendant's arguments for severance. He further reasoned that evidence of the charged acts would be mutually admissible in separate trials under Rule 404(b) of the Rhode Island Rules of Evidence in light of their probative value and the state's reasonable need to prove the charges; therefore, defendant would be in the same position whether the charges were joined or severed.

After trial, the jury convicted defendant of the offenses charged in counts 1 and 2, but found him not guilty of the offense charged in count 3. The defendant timely appealed. Before this Court, defendant raises four issues that we will address in the order that they appear in defendant's brief. Additional facts will be supplied as they become relevant to our consideration of the issues presented.

### Analysis

### I

### Misjoinder under Rule 8(a)

The defendant argues that the trial justice committed reversible error when he allowed the state to join remote and dissimilar sexual assault and molestation charges against him in a single indictment. Rule 8(a) permits the state to charge a defendant with multiple offenses in a single indictment or information. However, joinder is proper only when the offenses charged are, "of the same or similar character or are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." *Id.* "Because proper joinder under Rule 8(a) is a matter of law, we review *de novo* whether the state properly joined one or more charges in a single indictment * * *." *State v. Hernandez*, 822 A.2d 915, 918 (R.I.2003) (quoting *State v. Rice*, 755 A.2d 137, 142 (R.I.2000)).

When analyzing whether offenses charged are properly joined under Rule 8(a), as a "same or similar character" offense, we examine the base offenses charged, the location and time of the offenses, whether the offenses occurred within a close time span, the similarity of the victims, and the modus operandi of the offenses. *See, e.g., State v. Day*, 898 A.2d 698, 704 (R.I.2006); *Hernandez*, 822 A.2d at 918; *Rice*, 755 A.2d at 143.[5] The time

---

5. Our analysis under Rule 8(a) of the Superi-

or Court Rules of Criminal Procedure mirrors

span elapsing between the charged offenses is an important factor that we take into account under Rule 8(a). *See, e.g., Day,* 898 A.2d at 704 (observing similarities in offenses including the "two month time span"); *State v. Martinez,* 774 A.2d 15, 18 (R.I.2001) (affirming joinder of burglary and robbery offenses taking place a month apart because they involved similar conduct and a common plan occurring "over a relatively short period of time"); *State v. Hightower,* 661 A.2d 948, 954–55 (R.I.1995) (upholding joinder of charges for murder, kidnapping, breaking and entering with intent to commit larceny, and forgery with intent to defraud, when all offenses "took place within a timeframe of approximately five days" and were "virtually contemporaneous"). Even though we have upheld joinder of offenses when they are separated by a significant length of time, *see, e.g., State v. Goodreau,* 560 A.2d 318, 319–21 (R.I.1989) (sexual offenses spanning some six to seven years apart); *State v. Bernier,* 491 A.2d 1000, 1002–03 (R.I.1985) (sexual offenses against two victims occurring up to two and a half years apart); *State v. Whitman,* 431 A.2d 1229, 1230, 1233 (R.I.1981) (sexual offenses occurring over the course of two years), we

have yet to grapple with a time separation of this magnitude. On the other hand, we never have said that the passage of time, standing alone, is determinative of the issue of joinder.

■ The claim of misjoinder now before us involves offenses separated by a very considerable length of time, making this a troubling and admittedly close case. However, we hold that the offenses charged against this defendant properly were joined because they were "of the same or similar character." "We repeatedly have held that offenses of varying degrees of similarity are sufficiently 'of the same or similar character.'" *Day,* 898 A.2d at 704 (citing *Hernandez,* 822 A.2d at 918 and *Rice,* 755 A.2d at 143). In *State v. Lassor,* 555 A.2d 339, 345 (R.I.1989), this Court held that murder, attempted murder, and sexual assault offenses against four different victims were of a similar character when they each involved the strangulation or attempted strangulation of the victim, three of the victims were sexually assaulted, and they all had strong overtones of erotic motivation and brutality.

■ Even though count 1 alleges first-degree sexual molestation sexual assault

---

that of the First and Ninth Circuits, termed the "broader approach." *See* 1A Charles Alan Wright & Andrew D. Leipold, *Federal Practice and Procedure* § 143 at 43 (4th ed.2008). The First Circuit considers "whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred." *United States v. Boulanger,* 444 F.3d 76, 87 (1st Cir.2006) (quoting *United States v. Taylor,* 54 F.3d 967, 973 (1st Cir.1995)). Likewise, when determining whether offenses are "of the same or similar character," the Ninth Circuit analyzes factors such as, "the elements of the statutory offenses, the temporal proximity of the acts, the likelihood and extent of evidentiary overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims."

*United States v. Jawara,* 474 F.3d 565, 578 (9th Cir.2007) (holding fraud related to immigration documents and conspiracy to commit marriage fraud to avoid immigration laws were not of similar character). A more "categorical approach" to deciding whether offenses are similar under Rule 8(a) is employed by the Seventh Circuit. *See* Wright & Leipold, § 143 at 43. Under this method of analysis, "if offenses are of like class, although not connected temporally or evidentially, the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned." *United States v. Coleman,* 22 F.3d 126, 128, 133 (7th Cir.1994) (holding four firearm possession counts based upon four separate incidents occurring in April 1990, January 1992, May 1992, and June 1992 not misjoined because they were of a similar character and varied only in time and location).

and count 2 and 3 allege second-degree sexual assault and second-degree child molestation, the charges nonetheless are *similar* statutory offenses; they all involve sexual contact with a minor, and it is only the degree of the sexual contact that varies. This Court consistently has held that varying degrees of sexual misconduct are of a similar character. *See, e.g., Hernandez*, 822 A.2d at 918; *Rice*, 755 A.2d at 143; *State v. Waite*, 665 A.2d 1338, 1339 (R.I.1995); *Bernier*, 491 A.2d at 1003. For example, in *Waite*, 665 A.2d at 1339, the state charged the defendant with one count of second-degree child molestation and one count of second-degree sexual assault. This Court held that the offenses were "sufficiently similar in character to justify their joinder" even though one count required a showing of force and coercion and the other did not. *Id.* The Court reasoned that both offenses involved young women under fourteen and, in both, the defendant was "sexually assaulting a young baby-sitter as she slept at night in [the defendant's] home." *Id.*

Further, there are other commonalities between Pereira's offenses against his daughter in count 1 and against his niece in counts 2 and 3 that support joinder. The location of each offense was a bedroom of a family home, the victims both were young girls who were blood relatives of defendant, defendant used his position of trust as a family member to control both victims, and hand-to-genital contact was engaged in with respect to both victims.

We cannot but take notice that these offenses were separated by sixteen to twenty-one years; it is beyond question that they did not occur within even a reasonable proximity of time. Nevertheless, in the circumstances of this case, balancing all the relevant factors, it is our opinion that the similarities in the statutory offenses, the similarities of the victims both

in age and blood relationship to the defendant, and the similarities in the manner of operation of defendant's actions overcome the undeniable temporal remoteness.

## II

### Severance Under Rule 14

■ The defendant also maintains that the trial justice abused his discretion when he denied his motion for severance under Rule 14. Pereira argues that the state's evidence would not have been mutually admissible in separate trials, and, as a result, he was exposed to real and substantial prejudice because the jury would infer that he had a criminal disposition for sexual misconduct. He also argues that he became "confounded" in presenting separate defenses because he wished to testify with respect to the charges involving his daughter alleged in count 1, but not on the charges involving his niece alleged in counts 2 and 3. As a result, he contends, he was forced to elect not to testify at all.

■ Rule 14 provides that:

"If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

Rule 14, like Rule 8, protects defendants from prosecutorial harassment and unfair advantage, while at the same time balancing the public's interest in avoiding the cost of repetitive trials. *Bernier*, 491 A.2d at 1003. However, severance is not a matter of right, and the determination of whether to sever charges under Rule 14 lies within the sound discretion of the trial justice. *Day*, 898 A.2d at 704; *Hernandez*, 822 A.2d at 920. Therefore, this

Court will not disturb a trial justice's decision under Rule 14 absent a clear abuse of discretion. *Rice*, 755 A.2d at 143.

 "To prevail in demonstrating that a trial justice has abused this discretion, a defendant must show that the trial justice's denial of the motion to sever prejudiced the defendant to such a degree that he or she was denied a fair trial." *State v. King*, 693 A.2d 658, 663 (R.I.1997) (quoting *State v. Eddy*, 519 A.2d 1137, 1140 (R.I. 1987)). The defendant must show that he did, in fact, suffer real and substantial prejudice. *Whitman*, 431 A.2d at 1233; *State v. Sharbuno*, 120 R.I. 714, 717, 390 A.2d 915, 917 (1978). Whether the defendant has shown that he has suffered substantial prejudice is determined by balancing "efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other." *Day*, 898 A.2d at 705 (quoting *State v. Patriarca*, 112 R.I. 14, 29, 308 A.2d 300, 311 (1973)).

This Court has recognized that substantial prejudice can occur in a number of situations, as set forth in *Drew v. United States*, 331 F.2d 85 (D.C.Cir.1964):

"(1) [The defendant] may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which it found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find." *Patriarca*, 112 R.I. at 30, 308 A.2d at 311 (quoting *Drew*, 331 F.2d at 88); *see also Day*, 898 A.2d at 705; *Goodreau*, 560 A.2d at 321–22.

This Court also recognizes that prejudice may result from "a latent feeling of hostility engendered by the charging of several crimes as distinct from only one." *Day*, 898 A.2d at 705 (quoting *Patriarca*, 112 R.I. at 30, 308 A.2d at 311).

## A

### Confounding Defenses

We first consider defendant's contention that he was confounded in presenting his defenses. During the hearing on his motion to sever, defendant argued that he desired to testify so he could deny the charges in count 1, but "might not want to testify" with respect to counts 2 or 3 because he had made a potential admission relevant to those counts. He argued, therefore, that his right to a fair trial would be denied because he had a right to testify about the charges in one count and to decline to take the stand with respect to the others. On appeal, defendant advances those same arguments. He asserts that because the trial justice refused to sever the charges, he was forced to exercise his right not to testify at all and therefore was deprived of the opportunity to deny the charges set forth in count 1. This, he says, is particularly harmful to him because he wanted to testify that "the charge was fabricated against him by his hostile wife in cahoots with her family members and friends."

This Court previously has had occasion to address this theory of prejudice. *See Hightower*, 661 A.2d at 954; *Lassor*, 555 A.2d at 346. In *Lassor*, 555 A.2d at 346, the defendant argued that he was prejudiced when the trial justice denied his motion to sever the four charges against him because as a result, he opted not to testify. He argued that had the charges been severed, he would have testified on two of the charges. *Id.* The defendant in *Lassor* did not explain what testimony he would have offered had the charges been severed, nor did he supply specific reasons why he did not want to testify on the other

counts. *Id.* In denying his appeal, this Court held that this "vague and indefinite assertion" did not establish the real or substantial prejudice that would require a reversal of a trial justice's decision under Rule 14. *Lassor,* 555 A.2d at 346–47. The Court observed the federal rule that:

> "[N]o need for a severance exists until the defendant makes *a convincing showing both that he has important testimony to give concerning one count and strong need to refrain from testifying on the other.* In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reason for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." *Id.* at 347 (quoting *United States v. Park,* 531 F.2d 754, 763 (5th Cir. 1976)); *see also United States v. Tracy,* 989 F.2d 1279, 1283 (1st Cir.1993).

In *Hightower,* 661 A.2d at 954, we considered an argument that the defendant's right to a fair trial was prejudiced improperly by a dilemma caused by the defendant's desire to testify about the charges in one count but to assert his Fifth Amendment privilege on another count. There, we held that the defendant's "suggestion" and "speculation" were insufficient to overturn the trial justice's decision not to sever the counts in the indictment. *Id.*

We see the wisdom in the rule adopted by the federal courts. Severance should not be "mandatory every time a defendant wishes to testify to one charge but to remain silent on another. If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant." *United States v. Archer,* 843 F.2d 1019, 1022 (7th Cir.1988) (citing *United States v. Peters,* 791 F.2d 1270, 1287 (7th Cir.1986)). Therefore, a defendant must "offer in timely fashion 'enough information' so that the court can weigh 'the considerations of judicial economy' against the defendant's 'freedom to choose whether to testify' as to a particular charge." *United States v. Alosa,* 14 F.3d 693, 695 (1st Cir.1994) (quoting *United States v. Scivola,* 766 F.2d 37, 43 (1st Cir.1985)).

In the case before us, defendant has not offered any particularized showing of prejudice. Pereira did not inform the trial justice what important testimony he wished to give on count 1 concerning the allegations made by his daughter. He made no offer of proof and submitted no affidavit, nor did he even give any general indication of what the substance of any testimony would be. *Cf. United States v. Sampson,* 385 F.3d 183, 187, 190–93 (2d Cir.2004) (holding that the defendant made particularized showing after considering affidavit submitted to trial court providing the specific testimony the defendant wanted to give); *United States v. Jordan,* 112 F.3d 14, 17 (1st Cir.1997) (holding defendant likely deprived of defense to tax charges after considering offer of proof submitted at trial that recited the proposed testimony constituting his defense).

On appeal, even though defendant now suggests that he would have testified that his wife fabricated the allegations against him, he has failed to state specifically what testimony he would have offered. At the trial, Pereira's wife testified, and he was afforded ample opportunity to cross-examine her on her bias and motive. Indeed, defendant's lawyer elicited from Mrs. Pereira an acknowledgment that the couple had experienced marital problems that had

started before the allegations of abuse were made. Mrs. Pereira conceded that as a result of their divorce, defendant conveyed the marital domicile to her. Defense counsel's cross-examination also elicited testimony that Mrs. Pereira called a lawyer almost immediately after Amy's revelation, even before anyone contacted the police, and that within one or two days later, she withdrew a large sum of money from the couple's joint bank account. It is unclear what more defendant could have offered by his own testimony that could have been more compelling to his theory about his wife's motives to give false testimony.

Furthermore, defendant's mere assertion that he is "not guilty" has not been found to be the type of "important testimony," that is necessary to mount a defense that would outweigh the trial justice's consideration of judicial economy in a joint trial. *See United States v. Martin,* 18 F.3d 1515, 1519 (10th Cir.1994) (defendant's testimony that he is not guilty of the offense, that he did not possess the weapon or carry it for the purpose of a drug-trafficking offense is not "important testimony" requiring severance); *Alosa,* 14 F.3d at 695 (defendant's testimony that he did not use the gun for drug trafficking and that he owned guns for fun, not crucial testimony requiring severance). Therefore, it is our opinion that defendant has not shown that he has been prejudiced by the loss of an opportunity to offer vital testimony to the extent that it would deny him a fair trial.

## B

### Mutual Admissibility

We next consider defendant's argument that the charges in the indictment were not mutually admissible, and, as a result, he suffered prejudice arising from the jury's inference of criminal disposition and cumulation of evidence. "There can be no question that a potential for prejudice to a defendant can arise from admitting at trial evidence of other criminal activity that could tend to show the defendant's propensity to commit the particular crime charged." *Whitman,* 431 A.2d at 1231.

In general, the right to a fair trial "is not prejudiced by the joinder of charges in cases in which the outcome would have been the same if separate trials had been held." *State v. Evans,* 742 A.2d 715, 718–19 (R.I.1999). When the evidence admitted in a trial on the joined charges would be mutually admissible in separate trials, it is not likely that the defendant can show that he actually was prejudiced by the joinder. *See, e.g., Day,* 898 A.2d at 706; *State v. Cline,* 122 R.I. 297, 331–32, 405 A.2d 1192, 1211 (1979); *see also Drew,* 331 F.2d at 90 ("If * * * the evidence of each of the crimes on trial would be admissible in a separate trial for the other, the possibility of 'criminal propensity' prejudice would be in no way enlarged by the fact of joinder.").

Conversely, when the evidence may not be mutually admissible in separate trials, we are not compelled to assume that the defendant has been prejudiced. Indeed, federal courts have, in general, "found no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." *Drew,* 331 F.2d at 91 & n. 13 (citing federal court decisions).

In this case, when the trial justice denied defendant's motion to sever the charges, he ruled that the evidence of each offense would be admissible in separate trials because the allegations supported a clear pattern of behavior despite the twenty-one years that may have elapsed. He further said that:

"things that should be considered, as allowed in the trial of all matters together, is the defendant's activity to show sexual gratification, to prove that there was a common scheme or MO, so to speak, with young girls who he had control or influence over to show that there was an opportunity to abuse children of like age and also to counter any possible defenses of mistake or accident, and also explain why the defendant's niece did not report his abuse of her until many years after it occurred, and further to explain the context of the defendant's admission that he had previously sexually molested his niece."

We cannot say that the trial justice clearly was wrong when he decided that the evidence would have been mutually admissible. It is likely that evidence submitted to support the charge pertaining to defendant's abuse of his daughter may well have been admitted in a trial involving defendant's abuse of his niece to explain her delay in reporting the assault and to give context to defendant's admission that he had abused her. *See State v. Hopkins,* 698 A.2d 183, 185–86 (R.I.1997) (evidence of sexual misconduct occurring ten years prior was admissible to explain belated report of abuse). The evidence of defendant's abuse of his niece also may have been admissible in a separate trial pertaining to his abuse of his daughter to rebut an implied charge of fabrication. *See id.* (evidence of sexual misconduct also admissible to rebut implication that victim fabricated complaints, motivated by a stormy relationship).

 Nevertheless, we need not decide this issue based upon whether the evidence submitted at trial would have been mutually admissible in separate trials. Instead, we affirm the trial justice's decision because the evidence was straightforward, simple, and distinct and defendant has failed to show that he has suffered any real and substantial prejudice.[6] "In most instances, severance is not required under Rule 14 when 'the evidence related to each one of the counts is straightforward, simple, and distinct.'" *Day,* 898 A.2d at 705 (quoting *Rice,* 755 A.2d at 144); *see also Sharbuno,* 120 R.I. at 718, 390 A.2d at 918. "Experience has proven that juries are able to respond impartially to the trial evidence with the assistance given by instructions from the trial justice." *State v. LaRoche,* 683 A.2d 989, 998 (R.I.1996).

In this case, not only was the evidence presented by the state on each charge straightforward, simple, and distinct, but the trial justice also gave appropriate instructions. The state brought only three charges, involving only two victims. Each victim testified solely about the assault that she had experienced at the hands of defendant. The testimony and the evidence were uncomplicated. The trial justice also provided the jury with scrupulously appropriate instructions. He explained to the jury that to find defendant guilty of the charges, each alleged violation must be found separately. He said, "[i]f you find the defendant guilty of one of the charges you cannot automatically assume that he's guilty of any other charge." He also instructed the jury that

---

6. We caution, however, that our holding today should not be viewed as relieving the trial courts from continuing to closely examine the prejudicial effect of joint trials, particularly when the evidence may not be mutually admissible in separate trials. The trial courts "must not shirk their duties under [Super. R. Crim. P.] 14. They should vigilantly monitor for developing unfairness and should not hesitate to order severance at any point after indictment if the risk of real prejudice grows too large to justify whatever efficiencies a joint trial does provide." *Coleman,* 22 F.3d at 134.

Kim's testimony relating to other uncharged instances of abuse by defendant could be considered only for the limited purpose of whether defendant showed a lewd disposition towards her, and for no other purpose.

We are not blind to the possibility that a jury could become hostile and misuse evidence to infer a criminal disposition, particularly in a trial involving allegations of sexual misconduct, *see State v. Jalette,* 119 R.I. 614, 627, 382 A.2d 526, 533 (1978) (recognizing that evidence of other sexual misconduct is "uniquely apt to arouse the jury's hostility"). Here, however, the jury acquitted defendant of one of the charges. When we consider the trial justice's instructions, coupled with the jury's acquittal of defendant on count 3, we see no reason to believe that the jury became hostile, cumulated the evidence, or was prejudiced by inferring that defendant had a criminal disposition from which it assumed his guilt. *See LaRoche,* 683 A.2d at 998 (the defendant failed to show prejudice when he was acquitted on the two counts he alleged to be most damaging to his right to a fair trial); *Goodreau,* 560 A.2d at 322 (the defendant failed to show prejudice from joinder of sexual assault offenses when jurors acquitted the defendant on charges involving one of the victims); *Patriarca,* 112 R.I. at 30–31, 308 A.2d at 311 (the defendant failed to show that the jury cumulated the evidence, inferred criminal disposition, or showed hostility when the jury found the defendant guilt of conspiracy but returned no verdict on the substantive charges). In the circumstances of the case before us, Pereira has not demonstrated that he has suffered any real or substantial prejudice

that would outweigh this Court's consideration of the trial justice's legitimate concerns for judicial economy. Therefore, we will not disturb the trial justice's decision denying severance.

## III

### The Defendant's *Ex Post Facto* Arguments

■ Pereira argues that count 2 of the indictment should have been dismissed because it violates the *ex post facto* clauses of both the state and federal constitutions. Article I, section 10, of the United States Constitution prohibits any state from passing an "ex post facto law." Likewise, article I, section 12, of the Rhode Island Constitution provides, that "[n]o ex post facto law * * * shall be passed." [7] The United States Supreme Court has explained that the *ex post facto* clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Department of Corrections v. Morales,* 514 U.S. 499, 504–05, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (quoting *Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)). This Court has held that a violation of the *ex post facto* clause occurs when there is a "retrospective application of law that disadvantages an offender 'by altering the definition of criminal conduct or increasing the punishment for the crime.'" *Town of West Warwick v. Local 1104, International Association of Firefighters, AFL–CIO, CLC,* 745 A.2d 786, 788 (R.I. 2000) (quoting *State v. Desjarlais,* 731 A.2d 716, 717–18 (R.I.1999)).[8]

---

7. This Court construes the *ex post facto* clauses of the federal and Rhode Island constitutions in a like manner. *State v. Fiorenzano,* 690 A.2d 857, 858 n. 2 (R.I.1997).

8. The time-honored list of *ex post facto* prohibitions include:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.2d. Every law that aggravates a crime, or makes it greater than it was, when committed.3d. Every

Here, Pereira argues that the Legislature "doubled" the "quantum of punishment" for the offense for which he was convicted and that therefore his prosecution under count 2 violates the rule set forth in *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), because he was subject to a "possible" increase in penalty. In *Lindsey,* the state had charged the defendants with the crime of grand larceny. *Id.* at 398, 57 S.Ct. 797. The defendants were sentenced under an amended statute that had been amended after they had committed the crime. *Id.* at 398–99, 57 S.Ct. 797. In effect, the modification changed the penalty from a fifteen-year maximum sentence to a mandatory fifteen-year sentence. *Id.* at 400, 57 S.Ct. 797. The Court held that retrospectively applying a new "more onerous" penalty, one that removed the possibility of a sentence that would be less than fifteen years, violated the *ex post facto* clause. *Id.* at 401, 57 S.Ct. 797. The Court also ruled that it did not matter that under the old statute, the defendant might have received the same punishment, because "the ex post facto clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed." *Id.* It is significant, however, that the Court specifically reserved the question for the state to decide whether the defendants could be sentenced under the earlier statute. *See id.* at 402, 57 S.Ct. 797 ("Whether, in consequence of the invalidity of the later act, as applied to [the] petitioners, they may be sentenced under the earlier, is a question for the state court").

In our view, defendant's argument in this case puts the cart before the horse. Count 2 of the amended indictment charged Pereira with committing second-degree sexual assault of a victim thirteen years of age or younger, in violation of § 11–37–4(A), on a date between June 26, 1982 and May 10, 1984. At the time of the offense, the statute provided that second-degree sexual assault carried a punishment of "not less than three (3) years and not more than fifteen (15) years." Section 11–37–5. On May 2, 1984, the General Assembly repealed § 11–37–4(A) and enacted § 11–37–8.3 and § 11–37–8.4, thereby changing the penalty for the same act to "imprison[ment] for not less than six (6) years nor more than thirty (30) years." P.L.1984, ch. 59, §§ 1 and 2. Although the modified statute increased the possible penalty, it is significant that Pereira was not charged under this new statute in count 2; therefore, he was not subjected to the possibility of an increased penalty. Unlike *Lindsey,* the *ex post facto* clause is not implicated under these circumstances because Pereira was not charged with or penalized under a retrospective statute.

 Pereira, however, argues that the state could not have charged him with the repealed statute. He asserts that the old and new statutes are not the same; therefore, the simultaneous-repeal-and-re-enactment exception to the common-law abatement doctrine does not apply. The common-law rule of abatement provides that when the Legislature repeals a statute, a defendant cannot thereafter be convicted under the repealed statute, absent a savings clause. *State v. Souza,* 456 A.2d 775, 779 (R.I.1983). The theoretical

law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of

the commission of the offence, in order to convict the offender." *State ex rel. Webb v. Cianci,* 591 A.2d 1193, 1214–15 (R.I.1991) (quoting *Lerner v. Gill,* 463 A.2d 1352, 1356 (R.I.1983)).

foundation for the common-law rule presumed that "the Legislature by its repeal determined that the conduct in question should no longer be prosecuted as a crime." *State v. Babbitt*, 457 A.2d 1049, 1054 (R.I.1983) (citing *Ex parte Mangrum*, 564 S.W.2d 751, 753 (Tex.Crim.App. 1978)).

This Court, however, has recognized an exception to the common-law abatement rule. *See Babbitt*, 457 A.2d at 1054. The simultaneous-repeal-and-reenactment exception to the abatement doctrine provides that when the Legislature repeals a statute, but simultaneously reenacts the provision without substantial changes, the "new act should be considered a continuation of the old." *Id.* As a consequence, the Legislature is presumed not to have intended to pardon the behavior. *Id.; see also Sobey v. Molony*, 40 Cal.App.2d 381, 104 P.2d 868, 870 (1940) ("When a statute, although new in form, re-enacts an older statute without substantial change, even though it repeals the older statute, the new statute is but a continuation of the old. There is no break in the continuous operation of the old statute, and no abatement of any of the legal consequences of acts done under the old statute."). Therefore, this Court need not rely on a savings clause or other expression of legislative intent to permit prosecutions under the old statute. *Babbitt*, 457 A.2d at 1054.

In *Babbitt*, 457 A.2d at 1053, the indictment charged the defendant with violating the rape statute that was in effect at the time he committed the crime. However, after the commission of the crime, but prior to the indictment, the Legislature repealed the rape statute and reenacted it as the sexual-assault statute. *Id.* Because there was no pending prosecution at the time of the repeal, the later indictment was not covered by the general statutory savings provision. *Id.* This Court compared the old rape statute with the newly enacted sexual-assault statute and held that the reenactment did not reflect an intent to pardon violators of the old statute because every element of rape also was required to prove first-degree sexual assault under the new statute. *Id.* at 1054. The Court also held that certain changes to the statute were merely "amendatory in nature," and did not substantially change the elements of the crime. *Id.* The new statute expanded the meaning of sexual penetration by force and substituted the word "person" for the words "male" and "female," but "there was never a time when the elements of the offense were not considered criminal." *Id.*

In *Souza*, 456 A.2d at 779, the defendant was charged with a violation of the indecent-assault statute, which had been repealed before the indictment. The general savings clause also did not apply in that case because there was no pending prosecution at the time of the repeal. *Id.* Unlike in *Babbitt*, however, this Court held that the prosecution of the defendant under the repealed statute in that case was improper because when the General Assembly passed a new statute prohibiting the conduct, it included as a necessary element sexual gratification, something that was not required in the old statute. *Souza*, 456 A.2d at 780–81. We concluded that this was a "substantial change[ ]" that had the effect of abating all actions commenced under the old statute. *Id.* at 780.

■ As in the cited cases, the state charged Pereira under a repealed statute after the General Assembly enacted new legislation thereby making the general savings provision inapplicable. *See* G.L. 1956 § 43–3–23 (saving clause applies to prosecutions "pending at the time of the repeal"). The defendant's argument, as we comprehend it, asserts that unlike *Babbitt*, the new statute was not the same as

the old statute because there was an increased penalty; therefore, all actions under the old statute have abated. Conversely, the state argues that the old and new statutes are substantially the same and the increased penalty for the conduct in question supports the presumption that the Legislature did not intend to pardon defendant's conduct. We find the state's argument to be persuasive.

The relevant section of the repealed statute provided as follows: "A person is guilty of second degree sexual assault if he or she engages in sexual contact with another person and if any of the following circumstances exist: (A) The victim is thirteen (13) years of age or under." Section 11–37–4(A). The penalty for this offense was imprisonment "for not less than three (3) years and not more that fifteen (15) years." Section 11–37–5. The new statute provided that "[a] person is guilty of a second degree child molestation sexual assault if he or she engages in sexual contact with another person thirteen (13) years of age or under." Section 11–37–8.3, as amended by P.L.1984, ch. 59, § 2. An enhanced penalty for this crime was enacted, providing for imprisonment "for not less than six (6) years nor more than thirty (30) years." Section 11–37–8.4. Significantly, the definition of "sexual contact" remained substantively the same: "the intentional touching of the victim's or accused's intimate parts, clothed or unclothed, if that intentional touching can be reasonably construed as intended by the accused to be for the purpose of sexual arousal, gratification or assault." See P.L.1984, ch. 152, § 1 (amending § 11–37–1).

A comparison of the repealed and new statutes clearly demonstrates that the legislation was reenacted without substantial changes and that the elements of the crime remained the same. It is equally clear that the penalties were increased. Under the new statute, a violator is subject to a longer minimum sentence and is also in jeopardy of a longer maximum sentence. In our opinion, this increase in penalty is in no way a manifestation that the General Assembly wished to excuse this type of conduct or to designate it as no longer criminal in nature. See Sekt v. Justice's Court of San Rafael Tp., 26 Cal.2d 297, 159 P.2d 17, 23 (1945) ("where the later statute increases the punishment the Legislature has clearly demonstrated its intent that the act should be punished, and since the offender cannot be punished under the new law because of the ex post facto provision of the Constitution, he will be held under the old law. It is presumed from the very purpose of the amendment that the Legislature intended that all offenders should be punished * * *."). A continued intent to proscribe and punish is evident under these circumstances; the higher penalty is amendatory in nature and only operates prospectively. See State v. Broadway, 157 N.C. 598, 72 S.E. 987, 987–88 (1911) (holding amendment to a statute increasing the criminal penalty operated prospectively only, otherwise it would violate the ex post facto clause; therefore, prosecutions under old statute remained viable). But see State v. Mullen, 740 A.2d 783, 786 (R.I.1999) (holding state cannot prosecute defendant under old sodomy statute when Legislature amended statute with manifest intent to decriminalize such activity between consenting adults).

It is beyond debate that Pereira's alleged act of sexual contact with his niece, when she was between the ages of six and nine years old, was a crime when it was committed and remained criminal under the new statute. It certainly is true that the General Assembly cannot enhance the sentences of those committing proscribed acts under the repealed statute without violating the ex post facto clause. See Lindsey, 301 U.S. at 400–01, 57 S.Ct. 797

(increasing mandatory minimum sentence attached to a crime increases the possible penalty). However, it would be counterintuitive to conclude that the Legislature, by increasing the punishment attached to the acts, meant to pardon all previous offenders. *See Selct,* 159 P.2d at 23. Therefore, we hold that Pereira's prosecution under the old statute, with its less onerous penalty, was proper and that there has been no violation of the *ex post facto* clauses of either the state or federal constitutions.[9]

Although he has not articulated it with precision, defendant also appears to argue that his prosecution of sexual assault set forth in count 2 abated because the old and new statutes contained different statutes of limitation. We see no merit in this argument. At the time Pereira committed the assault of his niece alleged in count 2 (between June 26, 1982 and May 10, 1984), the statute of limitations for second-degree sexual assault was three years. *See* G.L.1956 § 12–12–17. On June 25, 1985, the General Assembly removed the limitations period for the offense of second-degree child molestation sexual assault. *See* P.L.1985, ch. 195, §§ 1–2 (amending § 12–12–17). Clearly, when the General Assembly removed the statute of limitations, it did not substantially change the elements of the crime. *See Babbitt,* 457 A.2d at 1054. It is beyond argument that the statute of limitations is not an element of the offense of sexual assault and it does not define the conduct prohibited. Furthermore, the statute of limitations was

not amended until the year after the repeal and reenactment of the sexual-assault statute. Therefore, the change to the statute of limitations did not amount to a substantial change that would abate prosecutions under the sexual-assault statute.

## IV

### Challenge to Admission of Prior Consistent Statement

■■■ Finally, defendant argues that the trial justice erred when he ruled that testimony given by Lucy, the family friend, about a statement Amy made was admissible under Rule 801(d)(1)(B) of the Rhode Island Rules of Evidence as a prior consistent statement. Rule 801(d)(1) provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive * * *." A proponent must show, however, "that the prior consistent statement was made 'prior to the existence of circumstances relied upon to discredit the credibility of the witness's testimony.' " *State v. Kholi,* 672 A.2d 429, 438 (R.I.1996) (quoting *State v. Damiano,* 587 A.2d 396, 401 (R.I.1991)). In other words, Rule 801(d)(1)(B) includes a temporal requirement that "the consistent statements must have been made before the alleged influ-

---

9. In his brief, defendant concedes that "it is likewise clear that where a statute of limitations is extended prior to the then-not-yet-time-barred action, no violation of the ex post facto clause occurs." *See Fiorenzano,* 690 A.2d at 861 ("When, as here, a statute of limitations is extended prior to the barring of an action, no violation of the ex post facto clause occurs."); *see also Stogner v. California,* 539 U.S. 607, 616–17, 632–33, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003) (holding *ex post*

*facto* clause prohibits legislature from reviving time-barred criminal cases but not disturbing state court holdings that legislatures retroactively may enlarge the statute of limitations for not-yet-time-barred prosecutions). It is evident that the prosecution of Pereira for acts committed between June 26, 1982 and May 10, 1984 had not been time-barred when the General Assembly removed the three-year statute of limitations on June 25, 1985.

ence, or motive to fabricate, arose." *State v. Briggs*, 886 A.2d 735, 751 (R.I.2005) (quoting *Tome v. United States*, 513 U.S. 150, 158, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995)).

 Specifically, defendant argues on appeal that Amy's prior consistent statement to Lucy, the family friend, did not antedate the asserted improper influence exerted upon her by her mother and her cousin, Kim. In this case, when defense counsel cross-examined Amy, he elicited testimony from her that when she first visited the CAC in November, she did not disclose the abuse, but that she did so during her second visit in January. Then, defendant's counsel questioned Amy about whether she spoke to her mother or to Kim about her father in between the two CAC visits.[10]

As a result, the prosecution sought to admit Lucy's testimony that Amy revealed the abuse to her on November 4, 2003. After defense counsel objected, the state explained that it sought to admit the testimony to rebut an implication of recent fabrication or improper influence. Defense counsel then argued:

"[the state] is trying to get the testimony in of Lucy * * * in an attempt to make the allegation that I established though my cross-examination of [Amy], that there was either a fabrication or improper influence or motive in her testimony as it related to her second visit in January with the Advocacy Center, because I established through her testimony that she spoke to [Kim] and her mother prior to the second—prior to the second conference at the Advocacy Center."

"It is my position that I don't think I impeached her credibility whatsoever. And if that testimony is going to be allowed, I'm requesting that it only be used to rehabilitate the credibility of [Amy] and not to establish validity to the facts that she asserts as to the touching."

The state responded that even though the statement should be admitted for the truth of the matter, it would not object to an instruction limiting the use of the prior

---

10. An illustration of the testimony is helpful to place the cross-examination in context:

"Q: Right. Okay. So, just to repeat and so we get this perfectly clear, on the first video on *November 12th* at the Child Advocacy Center, you never told them that your father touched your chixona; is that correct?
"A: Yes.
"Q: And even though they asked you that, you said nothing; is that right?
"A: Yeah.
" * * *
"Q: All right. Do you recall back in January of 2004, January the 16th, you once again went back to the Advocacy Center?
"A: Yes.
" * * *
"Q: Okay. Now, during that period of time from November to January, before you went back to the Advocacy Center, did you speak with anybody about these charges against your father?
" * * *

"Q: Well, didn't you speak with your mother concerning your father?
"A: Yeah.
" * * *
"Q: Okay. Now, during that period of time, from the first to the second time, did you ever speak with [Kim], your cousin?
"A: Yes.
" * * *
"Q: Did [Kim] tell you that your father was bad to her, to [Kim]?
"A: Yeah.
" * * *
"Q: Right. And what else did she tell you?
"A: That, um, that she, um—he, my father, did the same thing to her.
"Q: So, she told you that your father did the same thing to her. And then when you went back in January to the Advocacy Center—
"A: Uh-huh.
"Q: —is that when you told them that your father touched you?
"A: Yes."

consistent statement to rehabilitate Amy's credibility. The trial justice then found that the thrust of the cross-examination was to demonstrate that at the first CAC visit Amy did not remember the abuse, but then at the second visit, after she had spoken to her mother and Kim, she did disclose the event to the counselor. The court held that the prior consistent statement was admissible because it occurred before the alleged fabrication. The trial justice also opined that Amy's statement would be admissible substantively, but "in an abundance of caution," the trial justice said he would give a limiting instruction to the jury.[11] In response, defense counsel said: "All right." [12]

 This dialogue clearly illustrates that the defendant did not preserve for appeal the argument he makes to this Court. Our well-settled raise-or-waive rule provides that when a party fails to make a specific objection at trial, one that is "sufficiently focused so as to call the trial justice's attention to the basis for said objection," then the issue may not be considered on appeal and claims of trial error are considered waived. *State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994). At the defendant's own request, the trial justice provided the jury with a limiting instruction to which the defendant acquiesced. As a result, the statement was not admitted into evidence for the truth of the matter asserted, but for the limited purpose of rehabilitating the credibility of the witness. To the extent the defendant's objection was based on hearsay, such a claim of error cannot prevail on appeal when the evidence was not admitted for its truth. *See State v. Feole*, 748 A.2d 239, 243 (R.I.2000). To the extent the evidence was used to rehabilitate Amy's credibility, the trial justice accommodated the defendant's request and the defendant did not object to the substance of the requested instruction. Therefore, we see no merit whatsoever in the defendant's argument that Lucy's testimony was admitted wrongfully. *See State v. Brown*, 709 A.2d 465, 477 (R.I. 1998) (holding alleged error on appeal waived when the defendant failed to raise a bolstering objection at trial).[13]

---

11. Indeed, we previously have explained that "[p]rior to the adoption of our current rules of evidence, 'a prior consistent statement could be introduced not for the proof of the matter asserted but to rehabilitate the credibility of a witness whose veracity had been attacked by a suggestion of recent fabrication.'" *State v. Hazard*, 745 A.2d 748, 757 (R.I.2000) (quoting *State v. Damiano*, 587 A.2d 396, 400–01 (R.I.1991)). "Our adoption of the current rules of evidence changed the effect of a prior consistent statement by defining it as non-hearsay, thus admissible as substantive proof if 'offered to rebut an express or implied charge against [a witness] of recent fabrication or improper influence or motive.'" *Id.* (quoting *Damiano*, 587 A.2d at 401 and Fed.R.Evid. 801).

12. The trial justice gave the following instruction to the jury:

"Ladies and gentlemen, before you hear some testimony from this witness, I'm going to just give you a brief instruction. She is about to testify as to something that [Amy] said to her. You are to consider that, if you desire, only in determining the credibility or truthfulness of [Amy], not as to the truth of the matter asserted."

13. In our opinion, it deserves mention that even were we to address the issue substantively, we would conclude that Amy's statement to Lucy was properly admissible under Rule 801(d)(1)(B) of the Rhode Island Rules of Evidence. In *State v. Kholi*, 672 A.2d 429, 438 (R.I.1996), we held that the victim's statements to a school counselor that her stepfather had sexually abused her were admissible as prior consistent statements because they antedated her alleged motive to bring a civil suit against her stepfather for money damages. Here, the evidence was admitted in part to rebut any implication that Kim had improperly influenced Amy. Any improper influence that Kim could exert on Amy would have occurred after Amy's first visit to the CAC and before her second visit. During this

## Conclusion

For the foregoing reasons, we affirm the judgments of conviction. The record shall be remanded to the Superior Court.

ROBINSON, J., concurring.

After no small degree of hesitation and reflection, I have decided that I am able to join the Court's opinion without reservation. However, I wish to offer a few brief words of commentary on that opinion's holding with respect to the issue of joinder pursuant to Rule 8(a) of the Superior Court Rules of Criminal Procedure.

The Court's opinion quite correctly declares that this is "a troubling and admittedly close case." Nevertheless, decisions have to be made even with respect to close cases, and I believe that the decision made in this case is correct when one takes into account *all* the relevant factors. While the lapse in time between the incidents charged is extraordinarily lengthy in this case,[14] the striking similarity between what was alleged to have transpired in each instance is evident when one considers several other Rule 8(a) factors. This similarity has sufficed (although just barely) to convince me that the joinder of offenses in this case did not constitute an error of law. In plain English, I believe that the Court rightly holds that the remoteness in time

is,[15] in this case, outweighed by the following other factors that are properly grist for the judicial mill in the Rule 8(a) context:

(1) The fact that, in each instance, sexual contact with a minor was involved.

(2) The fact that, in the words of this Court's opinion, "[t]he location of each offense was a bedroom of a family home * * *."

(3) The fact that, again in this Court's words, "the victims both were young girls who were blood-relatives of defendant [and] defendant used his position of trust as a family member to control both victims * * *."

(4) The fact that "hand-to-genital contact was engaged in with respect to both victims."

Before concluding, I wish to indicate that, while I ultimately have become persuaded that the Court's Rule 8(a) holding is correct with respect to the specific facts that this case presents, the issue of joinder *vel non* always merits careful reflection. As is true with respect to so many other issues, Judge Learned Hand provided wise guidance concerning the issue of joinder. In *United States v. Lotsch*, 102 F.2d 35 (2nd Cir.1939), he wrote as follows:

"There is indeed always a danger when several crimes are tried together,

---

time, Kim had a conversation with Amy and told her that her father "did the same thing to her." Defense counsel's questions clearly raised the inference that Amy did not come forward with her allegations until after Kim talked to her. Under these circumstances, we believe that the trial justice did not err in allowing Lucy to testify about Amy's statement that her father touched her because the conversation took place before any possible influence arising from Amy's conversation with Kim.

**14.** As the Court notes, the offenses at issue "occurred some sixteen to twenty-one years apart."

**15.** Although Rule 8(a) of the Superior Court Rules of Criminal Procedure does not textually point to remoteness in time as a factor to be taken into account, it is nonetheless a factor that in actuality is taken into account. *See, e.g., State v. Day*, 898 A.2d 698, 704 (R.I.2006) (noting, while addressing a Rule 8(a) argument, that the crimes at issue "occurred within close proximity in downtown Providence, *within a two month time span,* * * * and the victims were close in age * * *.") (emphasis added).

that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." *Id.* at 36.

Having set forth these few additional thoughts, I am pleased to concur in the Court's opinion.