STATE

v.

Michael CIRESI.

Nos. 2010–253–C.A., 2010–254–C.A.

Supreme Court of Rhode Island.

July 5, 2012.

Lauren S. Zurier, Department of Attorney General, Providence, for State.

George J. West, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

"It takes many good deeds to build a good reputation, and only one bad one to lose it."[1] Strangely enough, the case before this Court involves a cast of characters called upon to recount their many bad deeds to build "good" reputations—or, at the very least, credible ones. In early 2008, over the course of a lengthy jury trial, the state presented approximately thirty witnesses, including known criminals, against the defendant, Michael Ciresi (defendant or Ciresi), a decorated North Providence police officer, who was charged with multiple counts ranging from the receipt of stolen goods to burglary. Ultimately convicted on all but one of the counts with which he was charged, Ciresi now appeals his convictions to this Court. On appeal, Ciresi contends that the trial justice abused his discretion by admitting numerous instances of Ciresi's uncharged misconduct under Rule 404(b) of the Rhode Island Rules of Evidence. Ciresi also challenges the trial justice's decision to allow the joinder of two separate indictments against him, as well as the trial justice's subsequent denial of Ciresi's motion to sever the indictments for trial. On April 11, 2012, this case came before the Supreme Court, sitting at Tolman High

---

1. Benjamin Franklin.

School in Pawtucket, Rhode Island. For the reasons set forth in this opinion, we affirm the judgments of the Superior Court.

# I

## Facts and Travel

The defendant in this case, Ciresi, was a career police officer with the North Providence Police Department, who began his tenure as a patrolman and swiftly advanced through the ranks of the department. He served as a narcotics detective, an assistant SWAT (special weapons and tactics) commander, a firearms instructor, and he was later promoted to the rank of sergeant. Described during trial as "a very aggressive police officer" who performed "[e]xemplary" work and produced a "prolific" arrest record, Ciresi was provided "a little more leeway than the average officer" in conducting his police work. Notwithstanding his good reputation, Ciresi was also known for being a "mischievous type of officer" who had "minor infractions [and would] bend the rules."

An investigation into the alleged disreputable and illegal endeavors by Ciresi underpinning the indictments at issue, discussed *infra*, was conducted following the police interview of an individual arrested during the course of an attempted burglary in the City of Pawtucket in December 2004. As the Pawtucket Police Department's investigation into the burglary progressed, information surfaced linking Ciresi to the burglary, as well as to further criminal activity in both Pawtucket and North Providence apparently effectuated through his use of criminal informants. As a result of this in-depth investigation,

Ciresi was charged by indictment in March 2006 with two counts of receiving stolen goods (a generator[2] and a bracelet) valued at over $500, in violation of G.L.1956 §§ 11–41–2 and 11–41–5 (counts 1–2); one count of receiving stolen goods (two watches) valued at under $500, in violation of §§ 11–41–2 and 11–41–5 (count 3); one count of attempted larceny of currency from an ATM machine, in violation of §§ 11–41–1 and 11–41–6 (count 4); one count of harboring a criminal in violation of G.L.1956 § 11–1–4 (count 5); and one count of obstructing two police officers while they were in the execution of their office and duty in violation of G.L.1956 § 11–32–1 (count 6).[3] More than one year later, a Providence County Superior Court grand jury indicted Ciresi on five additional counts—two counts of burglary in violation of G.L.1956 § 11–8–1 (counts 1 and 4); two counts of conspiracy to commit burglary in violation of § 11–1–6 (counts 2 and 5); and one count of using a firearm while committing a crime of violence in violation of G.L.1956 § 11–47–3.2(a) (count 3).

On December 5, 2007, a Superior Court justice heard the state's motion to consolidate the two indictments against Ciresi. The state premised its motion on the theory that Ciresi's actions alleged in the ten counts of the two indictments demonstrated a common plan or scheme "to benefit himself financially through illegal means." The trial justice granted the state's motion over defendant's objection, stating that "the common thread * * * that pervade[d] all of the charges [was] basically the cultivation and corruption of informants to [Ciresi's] personal benefit * * *." The trial justice further explicated that in his view, "the charges * * * in the two indict-

---

**2.** At the close of the presentation of evidence in Ciresi's trial, the trial justice reduced count 1 to a misdemeanor based on evidence of the generator's value.

**3.** Count 3, involving Ciresi's alleged receipt of two stolen watches, was dismissed prior to trial.

ments [did], indeed, fit within the rubric of a common scheme and plan, and that joinder should be had."

On January 22, 2008, the trial justice addressed several preliminary motions made by the parties, including a renewed request by Ciresi to sever the indictments. In denying the motion to sever, the trial justice emphasized that the state's allegations indicated that Ciresi had "a continuing plan and mod[u]s operandi, to 'do business' with those who [were] bent on criminal activity, be they informants or those whom he simply knew as criminals." He likewise noted that "[a]ll of these cases [were] intertwined, as [were] the relationships among and between the defendant and [the criminal witnesses]."

At that time, the trial justice also considered the state's motion *in limine* to admit certain evidence under Rule 404(b).[4] Specifically, the motion outlined thirty-nine evidentiary items to which six witnesses— five of whom were known criminals—were expected to testify during the course of Ciresi's trial. Noting that his review was "preliminary" in nature, the trial justice surmised that all of the proposed evidence constituted "typical [Rule] 404(b) material;" and he recognized that, "[a]lthough not alleged as offenses, they [were], nonetheless, actions that besp[oke] a common plan, [and] reflect[ed] the intent of the defendant, particularly as it relate[d] to using others, especially criminals, for his own benefit." Reviewing the proposed testimony of each of the five "criminal" witnesses specified in the motion, the trial justice

explained that he would permit such testimony of Ciresi's prior uncharged misconduct on a preliminary basis, with the exception of the proposed testimony of a fellow police officer, about which testimony the trial justice felt "on the fence."

To support its case against Ciresi, the state called more than two dozen witnesses over the course of nine days. One of the state's primary witnesses, Mark Pine (Pine), was a career criminal who testified about his dealings with Ciresi over the years, and who also was the individual arrested for the December 2004 burglary in Pawtucket that instigated the investigation into Ciresi's activities. According to Pine, he originally encountered Ciresi after he was arrested and charged with obstruction of justice following a traffic stop in North Providence in March 2000. Upon his release the next day after having entered a plea to the charge, Pine accompanied Ciresi to the Drug Enforcement Administration (DEA) headquarters in Warwick in an attempt by authorities to extract information from Pine concerning any knowledge of potential drug dealing.[5] Pine recalled providing no such information; consequently, Ciresi took Pine home. Upon dropping Pine off, Ciresi handed him a card and suggested that Pine give him a call. According to Pine, this overture initiated a four-year affiliation between the two men.

Although Pine characterized the beginning of this relationship as friendly in nature, he described the progression of his association with Ciresi as reflective of

4. Rule 404(b) of the Rhode Island Rules of Evidence provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, ab-

sence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

5. Pine's testimony indicated that drug paraphernalia found in his vehicle prompted the narcotics division to get involved in the matter.

more criminal features. Pine recalled his delivery of stolen transmission fluid, tires, and rims to Ciresi in 2002; and he further detailed how Ciresi, who had returned to the uniformed patrol by this time, acted as a lookout during four or five of Pine's thefts at a North Providence car dealership. Apparently, these dealings escalated to a higher level of criminal activity, involving: Ciresi's acceptance from Pine of an admittedly stolen gun; Ciresi's aid in Pine's escape from a police chase in Pawtucket after stealing a car; and Ciresi and Pine's conspiracy to burglarize an apartment on Charles Street in North Providence in September 2002.

In regard to the Charles Street burglary, Pine testified in great detail as to Ciresi's statements and actions in preparing for the planned break-in. According to Pine, Ciresi suspected that the apartment was home to a drug dealer who harbored a considerable quantity of money and drugs. Ciresi urged Pine to break a window, thereby giving Ciresi a pretense to be the first officer to respond. Pursuant to their agreement, Ciresi would burglarize the apartment and keep any money; Pine would receive the drugs. After twice canvassing the location together, they eventually put Ciresi's plan into action. Ciresi provided Pine with a small explosive device to place on the apartment's window while he proceeded to a pharmacy parking lot across the street to lie in wait. After placing the device, Pine left the scene, only to later discover that Ciresi had not recovered any drugs or money from the apartment after the explosion.

Soon after the Charles Street burglary, Pine was incarcerated on and off for two years for unrelated charges and parole violations. While out on parole, Pine continued his nefarious discussions with Ciresi, in which the two talked of setting up and robbing drug dealers, as well as a local jewelry store. None of these plans, however, came to fruition. Shortly after the completion of Pine's sentence in December 2004, the Pawtucket Police Department issued an arrest warrant for Pine's brother. Serving as a "middleman" between the Pawtucket police and his brother, Pine attempted to negotiate an arrangement by which Pine would provide information to law enforcement about a local drug dealer in exchange for the quashing of his brother's warrant. According to Pine, an agreement could not be reached—consequently, Pine instead offered the information to Ciresi in the hopes that Ciresi could persuade the Pawtucket police to drop the warrant. Based on information relayed from Pine's brother to Pine concerning the amount of heroin and cash at the suspected drug dealer's residence on East Avenue in Pawtucket, Ciresi and Pine planned a burglary.

At trial, Pine detailed the events of December 23, 2004, the day (or early morning hours) of the East Avenue burglary. He explained: (1) how Ciresi picked him up at his parents' home, accompanied by a third man unknown to Pine; (2) how Ciresi provided Pine with a mask, gloves, and a firearm; (3) how he and Ciresi entered the apartment and shouted "[s]earch warrant" and "[g]et on the floor;" and (4) how the two searched the apartment for drugs and money. After several minutes, Ciresi left the apartment—but, to Pine's dismay, he was not left alone. Two individuals were home in the bedroom of the apartment during the burglary and had called the police, who responded and ultimately arrested Pine. As mentioned, his subsequent statement to the police prompted the investigation into Ciresi's activities.[6]

6. Pine eventually pled *nolo contendere* to charges stemming from the 2002 Charles

After speaking to Pine, the Pawtucket police conversed with Ciresi via both a recorded telephone conversation and a videotaped in-person interview. During the interviews, Ciresi acknowledged that he knew Pine because he was a confidential informant and that Pine had indeed informed him about the East Avenue drug house. Although Ciresi had no jurisdiction to investigate a drug house in Pawtucket, he explained that he did not immediately contact the Pawtucket Police Department because he awaited confirmation from Pine as to the accuracy of the information. He admitted to dropping Pine off near the East Avenue apartment on the evening of the burglary, but claimed that he returned to work thereafter. When confronted with information indicating that a gun similar to Ciresi's off-duty weapon had been used in the burglary, Ciresi disclosed that his off-duty weapon was missing and surmised that Pine had stolen it from Ciresi's car.

Some of the evidence recovered from the East Avenue apartment corroborated Ciresi's involvement in the burglary. Moreover, information elicited from Ciresi during the interviews, as well as a review of his telephone records, further revealed questionable activity on the part of Ciresi. After delving deeper into Ciresi's associations with certain "informants," investigators uncovered additional dubious conduct by Ciresi, particularly relating to his relationships with four known criminals: Darryl Streeper (Darryl), Dean Streeper (Dean), Dennis Bautista (Bautista), and Thomas Casey (Casey)—all of whom testified at Ciresi's trial. Moreover, investigators soon discovered Ciresi's likely potential involvement in the 2002 Charles Street burglary.

At trial, the state called the Streepers (who are twin brothers) and Bautista to substantiate the charges set forth against Ciresi in the first indictment in regard to the receipt of stolen goods and attempted larceny. The first to testify of the three men was Darryl, a convicted criminal and drug user, who recounted his initial meeting with Ciresi during a traffic stop in 2003. Upon determining that Darryl's license was suspended, Ciresi gave Darryl "an ultimatum," and he demanded that Darryl "work with him" or be arrested. Because of a significant suspended sentence hanging over his head, Darryl ultimately obliged and provided Ciresi with information that led to multiple arrests.

According to Darryl, at some point his relationship with Ciresi began to change. Ciresi repeatedly loaned Darryl money; Darryl also kept Ciresi apprised of certain crimes that he committed with his twin brother, Dean, and Bautista, an acquaintance. One crime in particular involved the theft of tools and a generator from a heating and air-conditioning store, which items Darryl sold to Ciresi that evening. At trial, Darryl described numerous instances in which he sold Ciresi stolen merchandise and estimated that the practice had occurred "at least ten or fifteen times." In addition to his testimony about Ciresi's receipt of stolen goods, Darryl explained how his association with Ciresi prevented his arrest on multiple occasions during which he was stopped by police in North Providence for driving on a suspended license. During one stop in particular, on January 22, 2004, Darryl was unable to contact Ciresi during a traffic stop, and he was consequently cited. According to Darryl, he later contacted Ciresi, and asked if he would "take care of [the ticket]," with which request Ciresi apparently complied. It is this specific event that

---

Street burglary and the 2004 East Avenue burglary and, at the time of trial, was serving a fifteen-year sentence at the Adult Correctional Institutions.

formed the basis of the obstruction-of-justice charge asserted against Ciresi.

Notably, just one week prior to the East Avenue burglary in December 2004, Darryl, Dean, and Bautista's criminal ventures escalated when Bautista drove a van through a Providence gas station's window and stole an ATM machine. Although all three men originally discussed the plan at Darryl's residence, Darryl had a change of heart, and convinced his brother, Dean, to refrain from participation, as well. Perceiving the plan as too precarious, Darryl phoned Ciresi in an effort to "get [Bautista] out of [his] life," and he informed Ciresi as to Bautista's immediate intentions regarding the targeted gas station on Smith Street in Providence. According to Darryl, by the time he contacted Ciresi, the robbery was already in progress, and Ciresi was unable to thwart the attempt. After completing his crime, Bautista returned to Darryl's home, but ultimately walked over, with Dean, to his own nearby residence,[7] where he was apprehended by Ciresi and the North Providence police.

At trial, testimony elicited from three of Ciresi's fellow police officers revealed the nature of Ciresi's suspicious actions subsequent to receiving Darryl's telephone call concerning Bautista's plan. According to this testimony, Ciresi called a subordinate North Providence patrol officer and relayed his knowledge of Bautista's plot, including Bautista's name, the stolen vehicle he was driving, his target location, and his intended return address in North Providence—however, Ciresi advised the patrol officer not to stop the stolen vehicle, but instead to wait, to achieve a "better arrest" after the crime. Curiously, Ciresi did not notify the Providence Police Department of Bautista's intentions, despite the gas station's locus in that city.

Shortly thereafter, the North Providence police responded to Bautista's residence—where, according to Bautista, he and Dean had carried the ATM into the house's basement. Although the ATM machine was observed by one police officer as upright and intact upon first responding to the scene, another officer later observed Ciresi attempting to open the ATM with "[a] gray piece of metal" in the basement with Dean present. Ciresi later conflictingly reported, however, that he had interrupted Bautista in the basement trying to open the ATM.

At trial, both Darryl and Dean recounted Ciresi's subsequent attempts to buy their silence, which included retaining an attorney for Darryl and paying for a hotel room while the two men laid low in Seekonk, Massachusetts. Ultimately, however, the brothers surrendered to the Rhode Island State Police in September 2005 and cooperated with the state's investigation into Ciresi's activities.

Although several additional witnesses testified in support of the state's case against Ciresi, the only remaining testimony relevant to this appeal is that of Thomas Casey (Casey). Casey, a periodic drug user with a criminal record, did not testify to any acts underlying the charges of either indictment. Instead, Casey was called to the stand to attest to other prior misconduct by Ciresi in regard to his dealings with Casey. Recalling his initial encounter with Ciresi as occurring sometime in 2002, Casey described how he was "pulled over with a friend * * * [who] was apparently working for the North Providence Police at the time, trying to set [him] up for a drug deal * * *." Casey said that after he was taken into custody that day, Ciresi threatened to "go in the

---

**7.** Although Bautista did not permanently reside at this North Providence residence, he visited the home daily because his children and the children's mother lived there.

evidence room * * * and put something in [his] pocket" if Casey did not cooperate. After deciding to cooperate, Casey set up a drug dealer by luring him from Providence to North Providence for a controlled purchase, after which the dealer was arrested. Subsequently, Casey declined an offer by Ciresi to serve as a confidential informant, and remained out-of-contact with Ciresi for about a year.

Despite declining that invitation to serve as an informant, Casey admitted to later setting up at least two more drug dealers for Ciresi in 2003. He also recounted that in December 2004, after being stopped by Ciresi for motor vehicle violations, Ciresi offered leniency in exchange for Casey's cooperation in setting up more drug dealers. This time, according to Casey, Ciresi explained that for each dealer Casey baited into North Providence, Casey would receive the recovered drugs and half the cash. In accordance with this agreement, Casey telephoned Ciresi on December 23, 2004—the date of the East Avenue burglary—to discuss a potential setup for that week. Casey left Ciresi a message on that date, as well as a number of subsequent messages—however, Casey did not hear from Ciresi right away and the setups never came to fruition.

At the conclusion of Ciresi's trial, the jury returned with verdicts of guilty on all counts, with the exception of count 2 specified in the first indictment for the receipt of a stolen bracelet. On March 6, 2008, the trial justice considered, and denied, Ciresi's motion for a new trial. On May 29, 2009, the trial justice imposed the following sentences for each of Ciresi's nine convictions: (1) one year to serve for mis-

demeanor receipt of stolen goods; (2) ten years to serve for attempted larceny from the ATM machine; (3) five years to serve for the harboring of Darryl Streeper; (4) one year to serve for obstruction of justice; (5) thirty-five years, twenty years to serve and fifteen suspended, with probation, for the East Avenue burglary; (6) ten years to serve for conspiracy to commit the East Avenue burglary; (7) ten years to serve, consecutive to the East Avenue burglary sentence, but suspended, for the firearm charge; (8) ten years to serve for the Charles Street burglary; and (9) ten years to serve for conspiring to commit the Charles Street burglary. The trial justice directed that all of these sentences were to run concurrently aside from the firearm charge. On the date of his sentencing, Ciresi timely filed a notice of appeal with the Superior Court.[8]

## II

### Issues on Appeal

Ciresi proffers two primary arguments in his appeal. First, Ciresi challenges the trial justice's admission of thirty-seven instances [9] of Ciresi's prior uncharged misconduct through the testimony of Pine, Darryl Streeper, Dean Streeper, and Casey. Ciresi contends that this evidence should have been excluded as improper propensity evidence pursuant to Rule 404(b). As a corollary to this contention, Ciresi maintains that the trial justice should have granted his motion to strike Casey's testimony in its entirety, because Casey was not an actor or witness to any of the crimes charged in the indictments. Secondly, Ciresi maintains that the trial

---

8. Although judgments of conviction were not entered in the two Superior Court cases until June 11, 2008, Ciresi's appeal is considered timely by this Court. *See Otero v. State,* 996 A.2d 667, 670 n. 3 (R.I.2010).

9. Appended to Ciresi's appellate brief is an addendum specifying each of the thirty-seven pieces of evidence that Ciresi deems as improperly admitted during his trial.

justice erred in granting the state's motion for joinder, and abused his discretion in denying Ciresi's subsequent motion to sever, based on a determination that the indictments both involved charges concerning a common scheme or plan.

In countering Ciresi's disputations, the state argues that not only did the trial justice properly admit the evidence at issue, but also, during trial, Ciresi failed to object to the introduction of the bulk of the challenged evidence. The state also argues that the trial justice properly joined the indictments and consolidated them for trial because the offenses were based on acts or transactions connected together as parts of a common scheme or plan.

# III

## Discussion

### A

### Rule 404(b) Evidence

■ "This Court consistently has declared that the admissibility of evidence is a decision within the sound discretion of the trial justice, and will not be disturbed 'unless there has been a clear abuse of discretion and the evidence was both prejudicial and irrelevant.'" *State v. Dubois,* 36 A.3d 191, 199 (R.I.2012) (quoting *State v. Merida,* 960 A.2d 228, 237 (R.I.2008)). We are "disinclined to perceive an abuse of discretion so long as the record contains some grounds for supporting the trial justice's decision * * *." *State v. Moreno,* 996 A.2d 673, 678 (R.I.2010) (quoting *State v. Pitts,* 990 A.2d 185, 189–90 (R.I.2010)).

■ Furthermore, this Court has often recognized that "[t]he line between Rule 404(b) evidence presented for the impermissible purpose of demonstrating propensity and Rule 404(b) evidence presented for one of the specific non-propensity exceptions is 'both a fine one to draw

and an even more difficult one for judges and juries to follow.'" *State v. Rodriguez,* 996 A.2d 145, 150 (R.I.2010) (quoting *State v. Brown,* 900 A.2d 1155, 1160 (R.I. 2006)). "However difficult the task, the trial justice must exercise his or her sound discretion in fixing that line and deciding whether this type of evidence should be admitted, excluded, or limited." *Dubois,* 36 A.3d at 200 (citing *State v. Hopkins,* 698 A.2d 183, 186 (R.I.1997)). In ruling on the admissibility of Rule 404(b) evidence, a trial justice likewise considers the relevance of the evidence relative to its potential prejudicial effect; should such evidence demonstrate mere marginal relevance and great unfair prejudice, then the trial justice must exclude it. *See State v. Mlyniec,* 15 A.3d 983, 997 (R.I.2011) (citing *State v. DeJesus,* 947 A.2d 873, 883 (R.I.2008)); *see also* Rule 403 of the Rhode Island Rules of Evidence.

Before delving into the merits of Ciresi's evidentiary arguments, this Court must first address the state's assertion of waiver. The state emphasizes that the trial justice's rulings on its motion *in limine* were provisional in nature and that consequently Ciresi was required to make individual evidentiary objections throughout the trial in order to preserve those issues for purposes of appeal. The state also notes that Ciresi never requested a continuing objection to the introduction of his uncharged misconduct. In response, Ciresi argues that the trial justice's rulings concerning the state's motion *in limine* was not provisional, and that his "wholesale opposition" to the motion preserved the Rule 404(b) evidentiary issue for appeal, notwithstanding the presence or absence of individual objections in the record. Ciresi further avers that continuing individual objections made during the proceedings would have been "distracting and fu-

tile" given the trial justice's evidentiary rulings on the motion and during trial.

 It is well established that "the 'raise-or-waive' rule precludes a litigant from arguing an issue on appeal that has not been articulated at trial." *State v. Brown*, 9 A.3d 1240, 1245 (R.I.2010) (citing *State v. Bido*, 941 A.2d 822, 828–29 (R.I. 2008)). "Our long-standing rule is that a contemporaneous objection or at least a motion to strike * * * are prerequisites to an appellate review." *State v. Garcia*, 743 A.2d 1038, 1048–49 n. 7 (R.I.2000) (quoting *State v. Dettore*, 104 R.I. 535, 540, 247 A.2d 87, 91 (1968)). Proper preservation of an issue transpires if the party's objection is equally "timely and appropriate." *In re Jazlyn P.*, 31 A.3d 1273, 1280 (R.I.2011) (quoting *Brown*, 9 A.3d at 1245). Additionally, the objection must be "sufficiently focused so as to call the trial justice's attention to [its] basis * * *." *Brown*, 9 A.3d at 1245 (quoting *State v. Warren*, 624 A.2d 841, 842 (R.I.1993)).

 When considering a party's motion *in limine*, a trial justice is not required to render a final pronouncement concerning the admissibility of the evidence proposed to be excluded or presented at trial. *See State v. Fernandes*, 526 A.2d 495, 500 (R.I.1987) ("the granting of a motion in limine need not be taken as a final determination of the admissibility of the evidence referred to in the motion"). In fact, the very purpose of a motion *in limine* "is to 'prevent the proponent of potentially prejudicial matter from display-

ing it to the jury * * * in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.'" *State v. Torres*, 787 A.2d 1214, 1220 (R.I.2002) (quoting *Fernandes*, 526 A.2d at 500).

 In this case, the trial justice clearly and unequivocally classified the nature of his rulings on the state's motion *in limine* as preliminary. In that regard, the trial justice stated the following:

> "THE COURT: * * * I indicated to counsel * * * that I might not be in a position to rule on motions in limine prior to the commencement of testimony, because as the case unfolds, the landscape changes. But I have been able to look at some of this, and I think I have some *preliminary* decisions in mind that I can offer * * *." (Emphasis added.)

He further expressed that "[i]t seems to me, upon review of [the state's Rule 404(b) matters]—this is a preliminary sense I get—that this stuff is all typical [Rule] 404(b) material." In fact, the transcript is rife with references to the trial justice's consideration of the motion as provisional.[10] Thus, this Court is not persuaded by Ciresi's assertion that his overarching objection to the motion *in limine* prior to trial preserved all of the evidentiary issues that he now asserts on appeal. Moreover, we do not view any suppositious objections that Ciresi could, and should, have made during trial as futile,[11] particularly in light

10. For example, the trial justice emphasized that this "kind of material * * * is very relevant, very probative. To the extent that the defense claims it is prejudicial, it is not overly so, and, on balance, I feel it should be admitted. At least, that's my preliminary sense of what I'm reading here." Additionally, in regard to the proposed testimony of Casey, the trial justice stated that he would "permit his testimony as set forth here, again, unless something changes that I don't know about."

11. We note that the "futility exception" cited by both parties in their respective appellate briefs has been considered by this Court in the context of requests for cautionary instructions and motions for a mistrial following overruled objections. We have not addressed the role of this exception relative to the continued-articulation of objections during a witness's testimony, and we decline to do so in this case. *See, e.g., State v. Fortes*, 922 A.2d

of the fact that Ciresi never requested from the trial justice a continuing objection as to the introduction of uncharged misconduct. *See State v. Arroyo*, 844 A.2d 163, 169–70 (R.I.2004) (the defendant did not waive the issue of whether certain testimony constituted improper bolstering of expert testimony, as the defendant had a continuing objection).

Accordingly, we deem the majority of Ciresi's evidentiary issues raised on appeal to be waived. Nevertheless, the record does reflect that Ciresi did preserve certain issues, which we shall now substantively address. A review of the trial transcripts, in conjunction with the addendum submitted by Ciresi outlining his evidentiary issues on appeal, reveals that Ciresi preserved at best eight issues for appeal by voicing his objection to the introduction of certain testimony by Pine and the Streeper brothers. Ciresi also properly preserved his challenge to Casey's testimony in its entirety. Based on our review, Ciresi objected to testimony about (1) whether Pine's relationship with Ciresi began to "change" and how the two began discussing criminal activity; (2) how Pine relayed to Ciresi his plans to steal tires and rims from a North Providence car dealership and Ciresi's involvement in that venture; (3) how Pine escaped a Pawtucket police chase in a stolen car with the help of Ciresi; (4) how Pine had stolen a vehicle in Warwick to provide parts for Ciresi; (5) how Pine told Ciresi about guns that he stole and that he gave Ciresi one of the stolen firearms; (6) how Darryl and Ciresi discussed setting up drug dealers; (7) how Ciresi bought stolen goods from Dean and Darryl's thievery endeavors; and (8) how Ciresi purchased from Dean stolen saw blades. As mentioned, Ciresi also moved to strike Casey's testimony, particularly in regard to Ciresi's threat to plant evidence on Casey and the two men's arrangement in setting up drug dealers.

 "Rule 404(b) prohibits the use of evidence of past crimes, wrongs, or acts 'to show the defendant's propensity to commit the crime with which he [or she] is currently charged.'" *Rodriguez*, 996 A.2d at 150 (quoting *State v. John*, 881 A.2d 920, 926 (R.I.2005)). However, the rule deems such evidence to be admissible when offered "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident * * *." Rule 404(b). We have viewed this catalogue contained within Rule 404(b) "as examples, rather than a complete enumeration, of permitted purposes." *Rodriguez*, 996 A.2d at 150. Moreover, "evidence of a separate crime may be admissible if it has independent relevance in respect to the proof of an element material to 'the chain of proof of the crime in issue.'" *State v. Lemon*, 497 A.2d 713, 721 (R.I.1985) (quoting *State v. Acquisto*, 463 A.2d 122, 128 (R.I.1983)).[12]

143, 150 (R.I.2007) (request for cautionary instructions or motion for a mistrial would not have been futile because the trial justice did not overrule the defendant's objection); *State v. Simpson*, 658 A.2d 522, 528 (R.I. 1995) (request for cautionary instructions would have been futile in view of the fact that a trial justice had overruled defense counsel's objection); *State v. Mead*, 544 A.2d 1146, 1150 (R.I.1988) (trial justice twice summarily overruled the defendant's objections, thus "there would have been little point in requesting a cautionary instruction").

**12.** We note that, in cases involving sexual assault, a trial justice must also determine that any proposed evidence of uncharged misconduct is "reasonably necessary" for the prosecution to carry its burden of proof. *See State v. Mohapatra*, 880 A.2d 802, 806 (R.I. 2005). "[With] respect to non-sexual crimes, only independent relevance must be shown and the reasonable-necessity requirement is not a condition precedent to the introduction of such evidence." *State v. Garcia*, 743 A.2d 1038, 1052 n. 10 (R.I.2000) (quoting *State v. Acquisto*, 463 A.2d 122, 129 n. 3 (R.I.1983)).

"We also have permitted the introduction of 'other crimes' evidence when crimes are interwoven or in instances when introduction is necessary for 'a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence.'" *State v. Pona,* 948 A.2d 941, 950 (R.I.2008) (quoting *State v. Gomes,* 690 A.2d 310, 316 (R.I.1997)). "In cases * * * in which the evidence in question can be used for multiple purposes, some of which are permissible and others of which are not, the trial justice should issue specific instructions to the jury explaining 'the limited purpose [or purposes] for which the jury may consider it.'" *Garcia,* 743 A.2d at 1052 (quoting *State v. Gallagher,* 654 A.2d 1206, 1210 (R.I.1995)). Although the provision of such an instruction is considered by this Court to be "the better practice[,]" an instruction is only mandated in cases involving sexual assault. *Id.* at 1053.

■■ In this case, the trial justice appropriately articulated, in great detail, the test for the admissibility of evidence under Rule 404(b). Nearly three pages of transcript are dedicated to the trial justice's recitation of relevant case law and the applicable admissibility analyses under both Rules 404(b) and 403. He subsequently determined that the state's proposed Rule 404(b) evidence in its motion *in limine* constituted actions by Ciresi "that besp[oke] a common plan, [and] reflect[ed] the intent of [Ciresi], particularly as it relate[d] to using others, especially criminals, for his own benefit." He carefully considered, in turn, the proposed testimony of Pine, Bautista, the Streeper brothers, and Casey, finding the proposed testimony to be relevant, probative, and not overly prejudicial. During trial, the trial justice issued at least four limiting instructions concerning the evidence admitted of Ciresi's uncharged misconduct, in addition to his final instruction concerning the same prior to the jury's deliberations. In these limiting instructions, provided during Pine, Darryl, and Dean's testimony, the trial justice explained that such evidence was offered for very limited purposes and was to be considered, if at all, in regard to Ciresi's motive or his intent or some common plan or scheme that he may have had in connection with the charges before the jury.

Confining our review to the evidentiary issues that Ciresi has preserved, it is our opinion that the trial justice did not abuse his discretion in admitting the disputed testimony. Although the misconduct at issue was wide-ranging and involved multiple individuals, the evidence submitted was independently relevant to the elements of the crimes charged and snuggly fit within the exception under Rule 404(b) for acts showing Ciresi's motive, intent, modus operandi, plan and scheme relative to the charges against him. Specifically, the individual instances of uncharged misconduct demonstrated Ciresi's pattern of cultivating and protecting criminal informants in his role as a police officer for his own financial and professional gain. Furthermore, although not required to do so, the trial justice repeatedly provided to the jury thorough instructions about the limited purpose for which such evidence was admitted.

We likewise apply this reasoning in concluding that the trial justice did not abuse his discretion by allowing Casey's testimony at trial. Despite Casey's lack of affiliation with the underlying charges against Ciresi, Ciresi's behavior toward Casey in fostering him as an informal source emulated his behavior toward his other criminal informants who testified at trial. Although Ciresi may view Casey's testimony as evidentiary "overkill," such evidence was quite quintessential to the state's case

in light of Ciresi's defense, which involved heavily attacking the credibility of the prosecution's criminal witnesses.[13]

■ The Court is concerned, however, that Pine was permitted to testify, over Ciresi's objection, about how he informed Ciresi of some stolen firearms and about how Ciresi later met with Pine to take one of those guns. Although this instance of uncharged misconduct was understandably relevant, the prejudicial effect created by testimony of a stolen firearm is very high indeed. Nevertheless, in light of the overwhelming amount of evidence presented against Ciresi in his trial, we are satisfied that this determination by the trial justice, even if error, was harmless beyond a reasonable doubt. *See State v. Perez,* 882 A.2d 574, 590 (R.I.2005) (recognizing that when an involuntary statement has been admitted erroneously, this Court reviews both the statement and the remainder of the evidence against the defendant to determine whether its admission constituted harmless error beyond a reasonable doubt).

We note that Ciresi, on appeal, queries the trial justice's undertaking of a Rule 403 balancing exercise in admitting evidence of Ciresi's uncharged misconduct. *See State v. Gaspar,* 982 A.2d 140, 148 (R.I.2009) ("Rule 403 cuts across the rules of evidence and is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence."). In fact, Ciresi maintains that the trial justice patently neglected to weigh the relevancy and probative value of the uncharged misconduct against its prejudicial effect. Our review of the record reveals that the trial justice indisputably considered the rele-

vance, probative value, and prejudicial effect of the evidence at issue. Portions of his analysis are cited within this opinion.[14] Thus, we deem this contention by Ciresi to be wholly without merit.

Accordingly, we hold that the trial justice did not abuse his discretion in admitting the contested evidence of Ciresi's other uncharged misconduct under Rule 404(b).

**B**

**Joinder and Severance**

The second facet of Ciresi's appeal concerns the trial justice's joinder of the two indictments asserted against him for a consolidated trial. Specifically, Ciresi contends that the trial justice improperly consolidated the indictments "under the guise" of a common scheme or plan. In addition, Ciresi asserts that this improper joinder, as well as the denial of his subsequent motion to sever, "infringed upon [his] federal and state constitutional rights to a fair trial" because of the unfairly prejudicial result of the consolidation.

■ Rule 13 of the Superior Court Rules of Criminal Procedure addresses the joinder of indictments, informations, and complaints for trial. Rule 13 states as follows:

"The Court may order two (2) or more indictments, informations, or complaints to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment, information, or complaint. The procedure shall be the same as if the

---

13. Based on this observation, we reject Ciresi's argument that references of his prior misconduct could have been kept to a minimum by way of a stipulation between the state and the defense.

14. We direct the reader to footnote 10, *supra,* as an example of the trial justice's consideration of the tenets of Rule 403 of the Rhode Island Rules of Evidence in his analysis.

prosecution were under such single indictment, information, or complaint."

This Court's review of a trial justice's decision to join multiple indictments and/or informations for a single trial under Rule 13 involves the following two-step process, which implicates Rule 8 of the Superior Court Rules of Criminal Procedure. *State v. Hernandez*, 822 A.2d 915, 918 (R.I.2003). First, "[b]ecause proper joinder under Rule 8(a) is a matter of law, we review *de novo* whether the state properly joined one or more charges in a single indictment * * *." *Id.* (quoting *State v. Rice*, 755 A.2d 137, 142 (R.I.2000)). Second, "[i]f joinder is proper, the decision to grant the Rule 13 motion lies within the sound discretion of the trial justice and will not be disturbed absent a showing of a clear abuse of discretion." *Id.* (citing *State v. Fillion*, 785 A.2d 536, 541 (R.I.2001)). However, "even though offenses may be appropriately joined in a single indictment, [a] defendant may move for severance of said counts for purposes of trial in the event that he [or she] is able to show such prejudice as might constitute a denial of his [or her] right to a fair trial, pursuant to Rule 14 [of the Superior Court Rules of Criminal Procedure]."[15] *State v. Goulet*, 21 A.3d 302, 309 (R.I.2011) (quoting *State v. Lassor*, 555 A.2d 339, 345 (R.I.1989)).

Rule 8(a) addresses the joinder of offenses against a single defendant and "permits [such] joinder of offenses in the same indictment if the offenses charged are of the same or similar character or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." *State v. Trepanier*, 600 A.2d 1311, 1315–16 (R.I.1991) (citing *Lassor*, 555 A.2d at 345). Here, the trial justice determined that the offenses charged within the two indictments constituted parts of a common scheme or plan and thus were capable of joinder as a matter of law under Rule 8(a). Our *de novo* review of the charges and evidence submitted in this case yields the same result. Although the counts of the indictments involve different types of criminal activity and an assortment of witnesses, it is clear that the crimes for which Ciresi was indicted and ultimately convicted were segments of a common plan or scheme—the cultivation and corruption of criminal informants to the personal gain of Ciresi in his role as a police officer. *See State v. Martinez*, 774 A.2d 15, 18 (R.I.2001) (holding that, although the offenses for which the defendant was indicted stemmed from separate incidents, they involved a similar pattern of conduct and a similar plan, and indicated a common plan or scheme that was part of a larger criminal organization). Hence, the trial justice's legal determination on this front was not error.

Nor do we consider the trial justice's consolidation of the indictments for trial under Rule 13 and his subsequent denial of Ciresi's motion to sever under Rule 14 to be abuses of discretion.[16] "To

---

**15.** Rule 14 of the Superior Court Rules of Criminal Procedure states in pertinent part that

"[i]f it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

**16.** "It is well settled that questions of severance based on Rule 14 are [likewise] 'within the sound discretion of the trial justice, and we will not disturb his or her decision on appeal absent the showing of a clear abuse of discretion.'" *State v. Goulet*, 21 A.3d 302, 309 (R.I.2011) (quoting *State v. Fillion*, 785 A.2d 536, 541 (R.I.2001)).

prevail in demonstrating that a trial justice has abused [his or her] discretion, a defendant must show that the trial justice's denial of the motion to sever prejudiced the defendant to such a degree that he or she was denied a fair trial." *State v. Pereira,* 973 A.2d 19, 28 (R.I.2009) (quoting *State v. King,* 693 A.2d 658, 663 (R.I. 1997)); *see also State v. Mondesir,* 891 A.2d 856, 864 (R.I.2006). "It is not sufficient for the defendant to cite the potential for and the likelihood of prejudice. His burden is to demonstrate *substantial prejudice* resulting from the joinder." *State v. Day,* 898 A.2d 698, 705 (R.I.2006) (quoting *State v. Whitman,* 431 A.2d 1229, 1233 (R.I.1981)). "Substantial prejudice is determined by balancing 'efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other.'" *State v. Rivera,* 987 A.2d 887, 900 (R.I. 2010) (quoting *Pereira,* 973 A.2d at 28).

This Court has held that substantial prejudice may arise in the following circumstances:

"'(1) [The defendant] may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which it found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find.'" *Rivera,* 987 A.2d at 900 (quoting *Pereira,* 973 A.2d at 28).

Likewise, this Court has recognized that substantial prejudice "may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one." *State v. Patriarca,* 112 R.I. 14, 30, 308 A.2d 300, 311 (1973). Here, Ciresi maintains that the state's evidence would not have been "mutually admissible" in isolated trials, *Pereira,* 973 A.2d at 27, and, consequently, substantial prejudice arose because the jury would infer that he had a criminal disposition and would be "swayed" by the evidence's cumulative effect. Particularly, Ciresi stresses what he views as the undue risk of highly prejudicial "spillover" that was created by joining the indictments in light of the more serious burglary charges and gun charge set forth in only one of the indictments.

 "In general, the right to a fair trial 'is not prejudiced by the joinder of charges in cases in which the outcome would have been the same if separate trials had been held.'" *Pereira,* 973 A.2d at 30 (quoting *State v. Evans,* 742 A.2d 715, 718–19 (R.I.1999)). "When the evidence admitted in a trial on the joined charges would be mutually admissible in separate trials, it is not likely that the defendant can show that he actually was prejudiced by the joinder." *Id.* (citing *Day,* 898 A.2d at 706). Moreover, in *Pereira,* this Court highlighted that even in cases in which "the evidence may not be mutually admissible in separate trials, we are not compelled to assume that the defendant has been prejudiced." *Id.* Rather, severance under Rule 14 is generally not necessitated "when 'the evidence related to each one of the counts is straightforward, simple, and distinct.'" *Id.* at 31 (quoting *Day,* 898 A.2d at 705).

In this case, we are not persuaded by Ciresi's contentions that the trial justice abused his discretion in joining the indictments and denying his subsequent motion to sever. A review of the record indicates that the evidence of each charge in the first indictment would have been admissible under Rule 404(b) in a separate trial on the second indictment, and vice versa. "In conducting a Rule 14 analysis, this Court has stated that, although other criminal

acts may not be admitted to prove a defendant's propensity to commit a certain type of crime, 'evidence of other criminal acts would be admissible in order to show the defendant's guilty knowledge, intent, motive, design, plan, scheme, system, or the like.'" *Day*, 898 A.2d at 706 (quoting *Lassor*, 555 A.2d at 345). Given this mutual admissibility of evidence, Ciresi is certainly constrained in his ability to demonstrate that he actually suffered substantial prejudice during his consolidated trial.

Furthermore, "[t]his Court has adopted the presumption that 'juries are able to respond impartially to the trial evidence with the assistance given by instructions from the trial justice.'" *Rivera*, 987 A.2d at 901 (quoting *Day*, 898 A.2d at 705). Here, the trial justice provided measured instructions to the jury—he articulated that, "because [Ciresi] ha[d] been charged with more than one criminal offense, each alleged violation [had to] be considered * * * separately, and [that] the [s]tate ha[d] to prove its case beyond a reasonable doubt as to each violation." He further explained that, in regard to the admitted Rule 404(b) evidence, it was "admitted only for the limited purpose as it may * * * relate to [Ciresi's] motive, intent or common scheme or plan with respect to the charges for which he is presently on trial." The record in this case demonstrates that the trial justice's careful and considered instructions were indeed heeded by the jury—ultimately, Ciresi was acquitted on the charge of receipt of a stolen bracelet. Considering the trial justice's instructions, together with the jury's acquittal of Ciresi on count 2 of the first indictment, we discern "no reason to believe that the jury became hostile, cumulated the evidence, or was prejudiced by inferring that [Ciresi] had a criminal disposition from which it assumed his guilt." *Pereira*, 973 A.2d at 32; *see also Rivera*, 987 A.2d at 901.

Based on the defendant's failure to demonstrate any basis upon which we might conclude that he suffered prejudice arising from the consolidation of the indictments against him for trial, we hold that the trial justice's joinder pursuant to Rule 13 and denial of the defendant's Rule 14 motion to sever did not prejudice his constitutional right to a fair trial. We discern no abuse of discretion on the part of the trial justice and affirm his rulings, accordingly.

## IV

### Conclusion

For the reasons stated in this opinion, we affirm the judgments of the Superior Court. The record shall be remanded to the Superior Court.